John W. GARDNER, Secretary of the United States Department of Health, Education and Welfare, Appellant,

v.

The STATE OF ALABAMA, for and in Behalf of and as Trustee For the DEPARTMENT OF PENSIONS AND SECURITY of the State of Alabama, Appellee.

The STATE OF ALABAMA, for and in Behalf of and as Trustee For the DEPARTMENT OF PENSIONS AND SECURITY of the State of Alabama, Petitioner,

v.

John W. GARDNER, Secretary of Health, Education and Welfare, Respondent.

Nos. 24468, 24561.

United States Court of Appeals
Fifth Circuit.

Aug. 29, 1967.

Certiorari Denied Jan. 15, 1968.

See 88 S.Ct. 773.

Dept. of Justice, Washington, D. C., for John W. Gardner.

Reid B. Barnes, Sp. Asst. Atty. Gen., William G. Somerville, Birmingham, Ala., Gordon Madison, Asst. Atty. Gen., Mc-Donald Gallion, Atty. Gen., Montgomery, Ala., for State of Alabama.

Before GEWIN and AINSWORTH, Circuit Judges, and WEST, District Judge.

GEWIN, Circuit Judge:

The State of Alabama brought suit in the United States District Court for the Northern District of Alabama challenging the validity of an order issued by the Secretary of Health, Education and Welfare to terminate payment of approximately $100,000,000 in federal funds to the Alabama Department of Pensions and Security. The district court entered a preliminary injunction restraining the Secretary from enforcing the above order and the Secretary filed this appeal. The District Court expressly refrained from passing on the merits of the case. Alabama then petitioned this court for direct review of the Secretary's order, and its motion to consolidate the petition for review and the appeal was granted.

At the outset it seems appropriate to take note of the importance of this case. It is important because the real parties in interest are not parties to the controversy which gave rise to this litigation. The real parties in interest are the blind, the maimed and crippled, helpless old people, and innocent babies and children who are too immature even to realize that their fate is involved in these proceedings. We do not pause to fix the blame. Where the fault lies is not significant in view of the chief issues we must decide. There are many citizens in Alabama whose very existence and life's blood are dependent upon a proper resolution of the issues tendered to this Court. Undue delay, bickering and needless disputing will surely result in hunger, neglect and bitter hardship for those who are most interested. With these thoughts in mind, after giving the parties

Macon L. Weaver, U. S. Atty., Birmingham, Ala., John Doar, Asst. Atty. Gen., D. Robert Owen, Owen M. Fiss, Alan G. Marer, Alvin Hirshen, Morton H. Sklar, David B. Marblestone, Attys.,

ample time to present their briefs [1] and arguments we proceed with restrained haste and appropriate deliberation to render our decision.

Our conclusions and decision in specific terms appear hereafter, but speaking generally we hold: (a) the district court was without jurisdiction to hear this case; (b) the judgment and order of the district court granting a preliminary injunction is vacated and set aside; (c) the regulations of the Department of Health, Education and Welfare (HEW) are valid; (d) by executing compliance forms or their equivalent authorized and required by HEW the State of Alabama does not become a guarantor that third parties with whom it deals will discontinue discrimination on account of race, color or national origin, nor does the execution of such forms or their equivalent result in a contract upon which the Federal Government could institute legal proceedings for the recovery of funds paid to the state; and (e) the order of the Secretary will be enforced in accordance with this opinion subject to the stay of such enforcement as herein ordered and directed.

Title VI, Section 601 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Section 602, 42 U. S.C. § 2000d–1, directs "[e]ach Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, * * * to effectuate the provisions of section 601 * * * by issuing rules, regulations, or orders of general applicability * * *."

Pursuant to the above congressional authorization and directive, the United States Department of Health, Education and Welfare (HEW) promulgated a regulation, 45 C.F.R. Part 80, §§ 80.1–80.13, on November 27, 1964, which became effective after the President's approval on December 3, 1964. In language paralleling section 601, quoted above, § 80.1 of the regulation forbids discrimination in any program or activity receiving Federal financial assistance from the Department of Health, Education and Welfare. The regulation, at § 80.3(a) (b), further forbids any recipient of federal funds to engage in certain enumerated discriminatory practices either directly or indirectly. In addition, § 80.3(b) (2) of the regulation provides that recipients, in determining the kinds of services or benefits they will provide under any program of federal financial assistance, may not directly or indirectly utilize criteria or methods of administration which are discriminatory.

The regulation also requires, at § 80.4 (b), the following statement of compliance:

"Every application by a State or a State agency to carry out a program involving continuing Federal financial assistance * * * shall as a condition to its approval and the extension of any Federal financial assistance pursuant to the application (1) contain or be accompanied by a statement that the program is * * * conducted in compliance with all requirements imposed by or pursuant to this part, or a statement of the extent to which it is not, at the time the statement is made, so conducted, and (2) provide or be accompanied by provision for such methods of administration for the program as are found by the responsible Department official to give reasonable assurance that the applicant and all recipients of Federal financial assistance under such program will comply with all requirements imposed by or pursuant to this part, including methods of administration which give reasonable assurance that any noncompliance indicated in the statement under subparagraph (1) of this paragraph will be corrected." 45 C.F.R. Part 80, § 80.4(b) (1964).

1. The final brief was filed on June 27, 1967.

Essentially this provision requires the State agency to issue a statement that it will administer its programs nondiscriminatorily and if discrimination is being practiced, it is to be outlined in the statement along with appropriate methods for its correction. If the State agency refuses to submit the assurance described above, the regulation at § 80.8(b) authorizes the termination of Federal financial assistance in accordance with prescribed procedures.

The Alabama State Department of Pensions and Security is the State agency responsible for administering and supervising the administration of four Public Assistance programs and in addition, one program for Child Welfare Services. The State plans covering these programs have been approved for the receipt of Federal financial assistance under the following titles of the Social Security Act, as amended, 42 U.S.C. §§ 301–306, 601–609, 721–728, 1201–1206, 1351–1355:

Title I—Old-Age Assistance and Medical Assistance to the Aged. (Known in Alabama as "Old-Age Pension and Medical Assistance to the Aged.")

Title IV—Aid to Families with Dependent Children. (Known in Alabama as "Aid to Dependent Children.")

Title V
(Part 3)—Child Welfare Services

Title X—Aid to the Blind

Title XIV—Aid to the Permanently and Totally Disabled

Accordingly, the Alabama Department has received and continues to receive such assistance in furtherance of such programs.

After adoption of the HEW regulation, copies were sent to each state welfare agency along with information concerning relevant portions of the regulation. In addition, HEW sent to all state agencies administering approved public assistance plans a handbook which outlined the state agency's responsibilities, explained the assurance requirement, and contained a suggested sample assurance form. By August 1965, *every state except Alabama* had filed an assurance accepted by HEW as adequate under § 80.-4(b).

Efforts to negotiate with the Alabama Department so as to bring that agency into voluntary compliance with the regulation were extensive. Needless to say they were unproductive. On August 17, 1965, the Commissioner of Welfare formally advised the Alabama Department of its noncompliance and, acting under section 602 of the Civil Rights Act and §§ 80.8(c) and 80.9 of the regulation, the Commissioner offered the Alabama Department an opportunity for an administrative hearing.

Three days later the Alabama Department sent to the Commissioner by letter a statement of "compliance with Title VI of the Federal Civil Rights Act of 1964." While the letter stated that there were no discriminatory practices in the use of physical facilities of the Alabama Department or the offices of County Departments which are located in buildings under the control of the State, it indicated that discrimination existed in the physical arrangement of county offices which are furnished office space by local governing bodies. Also the letter pointed out that segregation existed in some institutions, agencies and organizations such as hospitals, nursing homes, children's institutions, and training schools, who by contract or other arrangement with the Alabama Department dispense aid, care, services and other benefits to recipients of the various programs. The Commissioner found that the letter could not be accepted as an adequate statement of compliance. The primary objections were that although the Alabama Department's statement of compliance indicated that some of the private institutions, agencies and organizations which provide services under the Federally-assisted programs do so on a discriminatory basis, the statement did not indicate what methods the Alabama Department would implement to correct this situation. Nor had the Alabama Department taken ap-

propriate action to determine the extent of noncompliance of these third-parties.[2]

An evidentiary hearing was held on October 21, 1965, at which time the hearing examiner considered Alabama's objections [3] to the requirement that it sign a statement of compliance. The examiner found that the Alabama Department had not submitted an adequate statement of compliance which met the requirements of § 80.4(b) of the regulation and recommended termination of Federal financial assistance to the State of Alabama. The Examiner's decision was adopted by the Commissioner and on January 12, 1967, the Secretary of Health, Education and Welfare, approved the Commissioner's decision and ordered termination of Federal funds to the Alabama Department, effective midnight February 28, 1967.

The State of Alabama for and in behalf of and as trustee for the Alabama Department of Pensions and Security [4] brought suit in the district court on January 13, 1967, invoking its jurisdiction under 28 U.S.C. § 1331 and the Administrative Procedure Act § 10, 5 U.S.C. § 1009(a) (1964), now 5 U.S.C. § 702 (1966), challenging the validity of the Secretary's order and the underlying regulation requiring the submission of the assurance as a condition of continuing to receive Federal financial assistance. The Secretary filed a motion to dismiss asserting that the United States Court of Appeals for the Fifth Circuit had exclusive jurisdiction to review the action of the Secretary. The district court granted Alabama's motion for a preliminary injunction on the ground "that in each and every program irreparable injury and damage will be done if the cutoff of Federal funds becomes effective, * * *" The Secretary filed a notice of appeal and Alabama filed in this court a petition for direct review of the Secretary's order invoking jurisiction under Title XI § 1116 of the Social Security Act, 42 U.S. C. § 1316, and Section 603 of the Civil Rights Act, 42 U.S.C. § 2000d-2, with respect to four of the five welfare pro-

2. The term third parties is used to refer to the private hospitals, child care centers, nursing homes, physicians, etc. which participate in the state programs by providing services to beneficiaries of the various Alabama welfare programs. The State of Alabama and HEW have also referred to those persons, institutions and agencies as third party vendors.

3. Since Alabama has presented to us substantially the same objections, which are dealt with extensively later in this opinion, we will not detail them here.

4. The State of Alabama subsequently amended its complaint to join four individuals receiving public assistance from the Alabama Department of Pensions and Security of the State of Alabama as parties plaintiff on behalf of themselves and on behalf of all persons receiving public assistance benefits under Title 49, Alabama Code of 1940 (recompiled 1958). These four individuals assert that they will suffer a legal wrong if Federal funds are terminated and that they are aggrieved within the meaning of 5 U.S.C. § 702 (1966), formerly 5 U.S.C. § 1009 (a) (1964), and within the meaning of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d-2 (1964). The district court allowed the filing of the amendment over the Secretary's objection that the four individuals did not have standing to sue. The nature of the amendment, its time of filing and notice to the Government is reflected by the following excerpt from the court's order:

"At the beginning [February 1, 1967] of the hearing plaintiff asked leave to file a second amendment to the complaint joining four individual parties as plaintiff, alleging that each was a recipient of public welfare funds in Alabama and eligible therefor, and that all four were residents of Jefferson County in the Northern District of Alabama. The amendment, by its terms, was a class suit for the benefit of all welfare recipients throughout the state, upon averment that they were so numerous that it was impracticable to name them in the suit, in effect. In this amendment the individual plaintiffs alleged that they adopted the allegations of the complaint theretofore filed. Upon inquiry, the Department of Justice attorneys, representing the Secretary, stated that they had received a copy of the amendment the night before and made known to the Court that defendant does not consent to the filing that it was at least questionable whether the individuals had standing to sue. The Court allowed the filing of this amendment."

grams. Alabama's petition for review contended that jurisdiction to review the Secretary's order with respect to all five programs was properly in the district court, but that "in the alternative, * * * if under the statutes the United States Court of Appeals for the Fifth Circuit has sole jurisdiction over the four welfare programs * * * such a review is hereby sought. * * *" As stated, the appeal and the petition were consolidated.

Initially we are confronted with the question of jurisdiction. Alabama submits that the district court has jurisdiction to review the Secretary's order. It is contended by the Secretary that this court has sole and exclusive jurisdiction. However, Alabama also suggests that if this court has exclusive jurisdiction, such jurisdiction relates only to four out of the five state programs. After a careful study of the applicable statutes we conclude that the Court of Appeals has sole and exclusive jurisdiction to review the Secretary's order as it applies to all five programs, and having reviewed the same we find that the order and regulation are valid.

### I.

Section 603 of the Civil Rights Act provides that any "agency action taken pursuant to section 2000d–1 of this title [§ 602] shall be subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds." If judicial review has not been provided, section 603 states that agency action terminating Federal funds for failure to comply with any requirement imposed pursuant to section 602 may be reviewed in accordance with the Administrative Procedure Act § 10, which provides for review in any court specified by statute or in the absence or inadequacy thereof " * * * in a court of competent jurisdiction." 5 U.S.C. § 703 (1966), formerly 5 U.S.C. § 1009(b) (1964).

■ The Social Security Act specifically provides for judicial review of agency action terminating federal money under four out of the five titles involved in this litigation, Titles I, IV, X and XIV. Title XI § 1116 of the Social Security Act, 42 U.S.C. § 1316(a) (3), declares that such judicial review is to be had in the court of appeals for the circuit in which the state is located. We quote:

> "Any State which is dissatisfied with * * * a final determination of the Secretary under section 304, 604, 1204, 1354, 1384 or 1396(c) of this title may * * * file with the United States court of appeals for the circuit in which such State is located a petition for review of such determination."

Consequently, since section 603 of the Civil Rights Act states that termination of funds under 602 is reviewable in the same manner as may be provided for review of the termination of funds under other sections of the Social Security Act, and since such review has been provided, jurisdiction to review the Secretary's order as it relates to the assistance programs under Titles I, IV, X and XIV has been specifically placed by statute in this Court.

■ We also conclude that the jurisdiction conferred upon this Court by section 603 of the Civil Rights Act of 1964 and 42 U.S.C. § 1316 to review the Secretary's order is sole and exclusive. It is well settled that if Congress, as here, specifically designates a forum for judicial review of administrative action, that forum is exclusive. Whitney Nat'l Bank in Jefferson Parish v. Bank of New Orleans & Trust Co., 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965); Fletcher v. United States Atomic Energy Commission, 89 U.S.App.D.C. 218, 192 F.2d 29 (1951) cert. den., 342 U.S. 914, 72 S.Ct. 361, 96 L.Ed. 684 (1952). And this result does not depend on Congress using the word "exclusive" in the statute providing for a forum for judicial review. Whitney Nat'l Bank in Jefferson Parish v. New Orleans Bank, supra; Black River Valley Broadcasts, Inc. v. McNinch, 69 App.D.C. 311, 101 F.2d 235, cert. den., 307 U.S. 623, 59 S.Ct. 793, 83 L.Ed. 1501 (1938).

The State of Alabama attacks the statutory review established by section 603 of the Civil Rights Act of 1964 and the Social Security Act, 42 U.S.C. § 1316, on the basis that the reference in the Civil Rights Act to "judicial review as may otherwise be provided by law" is limited to judicial review already in existence when the Civil Rights Act was enacted. Since the provisions of 42 U.S. C. § 1316 were not enacted until July 30, 1965, well after the passage of the Civil Rights Act, Alabama argues they are inapplicable. We see no merit in this strained interpretation of section 603. The language of the statute does not say such judicial review as may *already* have been provided. Further, we do not think the legislative history of section 603 supports Alabama's contention that the section is to be read in such a limited manner. Rather, we think, had Congress meant to restrict review of agency action taken pursuant to section 602 solely to methods of judicial review already in existence, it would have specifically stated that such was its intention.

Title V (part 3) of the Social Security Act relates to child welfare services and only involves about one million of the hundred million in federal funds which were terminated by the Secretary's order. The Social Security Act does not provide for judicial review of the termination of funds under this Title. This silence is the basis of Alabama's claim that it can seek review in the district court of the Secretary's order as it relates to all five titles. Alabama contends that since no provision is made for judicial review in the Social Security Act, under section 603 of Title VI of the Civil Rights Act and § 10 of the Administrative Procedure Act, review of the Secretary's order with respect to Title V (part 3), child welfare services, must be in the district court. Consequently, Alabama asserts, the statutory review provided by 42 U.S.C. § 1316 for the other four titles involved in this litigation is "inadequate" since such provisions do not cover the entire case as initiated by the State of Alabama. In view of our finding that the district court was without jurisdiction to review the Secretary's order with respect to Title V (part 3) we do not reach the question of "inadequacy". Our decision that we have sole and exclusive jurisdiction to review the Secretary's order as it relates to all five programs is based on a consideration of the nature of the several welfare programs and sensible judicial administration. In view of these considerations we construe section 603 provided for judicial review "as may otherwise be provided by law for similar action taken by such department or agency on other grounds," and 42 U.S.C. § 1316 to vest in this court by implication the authority to review the Secretary's order with respect to Title V (part 3).

Titles I, IV, X and XIV of the Social Security Act are concerned with state agencies operating and administering certain state-wide programs. Any federal administrative action taken against an agency affecting state-wide operations should be subject to speedy and final judicial review. Consequently, review of the state programs under Titles I, IV, X and XIV is in the courts of appeals. Title V (part 3), like the other four titles, is also concerned with a state-wide program, child welfare, and requires the state agency to submit a state plan as a condition to eligibility for federal funds. Hence, federal action taken against such state agency under Title V (part 3) should be subject to the same review provisions.

The only specific Congressional authorization in the Social Security Act that review be in the district court is where benefits are terminated under Title II of the Act dealing with federal old-age survivors and disability payments. 42 U.S.C. § 405(g). Such review was placed in the district court because logically the complainant in a Title II proceeding would be a private individual of modest means. This reasoning is wholly inapplicable to Title V (part 3) where normally the state would be the complaining party.

It must also be noted that Title V (part 3) is closely related to the child welfare

services provided to needy families under Title IV. One requirement of a child welfare plan under Title V (part 3) is that it must provide for adequate coordination with the child welfare programs under Title IV (Aid to Dependent Children). 42 U.S.C. § 723(a) (1) (A). The aim of these two programs, working closely together, is to provide proper and adequate services for the children and their families under these state programs. Since the statute expressly vests review of Title IV in this court, economic judicial administration suggests that the two programs should be reviewed together. Both are essentially a part of each other and are inevitably tied together.

Therefore, consistent with sound principles of judicial administration and the overall scheme of judicial review set forth in section 603 of the Civil Rights Act and the Social Security Act, 42 U.S.C. § 1316, we conclude that this court has sole and exclusive jurisdiction to review the Secretary's order as it relates to all five state programs.

Subsequent to oral argument in this case the Supreme Court decided the cases, Toilet Goods Ass'n v. Gardner, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697; Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681; and Gardner v. Toilet Goods Ass'n, 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (May 22, 1967). Alabama contends that such decisions support their contention that the district court has jurisdiction of the Secretary's order with respect to all five titles. We disagree. The issue before the court in the above cases was whether the validity of certain regulations promulgated by the Commissioner of Food and Drugs could be attacked prior to enforcement in light of the fact that the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 et seq., contained no specific provisions for review of the subject regulations. Further the court was faced with the issue of whether the questions presented were ripe for judicial resolution. The court found nothing in the Food, Drug and Cosmetic Act which barred a pre-enforcement suit under the Administrative Procedure Act, 5 U.S.C. §§ 701–704, (1966), formerly 5 U.S.C. § 1009 (1964), and the Declaratory Judgment Act, 28 U.S.C. § 2201, and also found the controversies presented in Abbott Laboratories and Gardner v. Toilet Goods ripe for adjudication. The parties did not raise the question of whether the court of appeals was the proper court to review the validity of the regulations in issue, as opposed to the district court. In fact the Government consistently argued that they could not be reviewed in any court prior to enforcement. Consequently the court did not rule specifically on this question. Furthermore, since no specific judicial review had been authorized, we do not interpret the court's decisions as holding that if the Act had contained such provisions, they could be ignored leaving the parties free to bring an action under other statutes providing methods of review. Therefore, we find these decisions inapplicable to the issues before us.

■ The action of the State of Alabama in joining four private individuals [5] as parties plaintiff in the suit filed in the district court, does not defeat the sole and exclusive jurisdiction of this court granted by statute over actions brought by a State to review an order terminating Federal funds to a state agency. Whether such individuals may bring a separate cause of action, have standing to sue, or may properly be joined with the State of Alabama in its petition for direct review by this court are issues which are not before us. We merely hold that the district court did not have jurisdiction over the action originally filed by the State of Alabama, since the applicable statutes dictate that this court is the proper court for review of the Secretary's order, and that jurisdiction was not conferred on the district court in the action brought by Alabama by the joinder of private litigants in the circumstances here present.

## II.

Alabama's attack on the validity of the regulation, 45 C.F.R. Part 80, §§ 80.1–80.-

5. See footnote No. 4, supra.

13 is primarily directed at § 80.3(b) and paragraphs 1 and 4 of the sample statement of compliance form issued by the Department of Health, Education and Welfare, 45 C.F.R. § 80.3(b) states in pertinent part:

"*Specific Discriminatory actions prohibited.*

(1) A recipient under any program to which this part applies may not, directly or through contractual or other arrangements, on ground of race, color, or national origin:

(i) Deny an individual any service, financial aid, or other benefit provided under the program;

(ii) Provide any service, financial aid, or other benefit to an individual which is different, or is provided in a different manner, from that provided to others under the program;

(iii) Subject an individual to segregation or separate treatment in any matter related to his receipt of any service, financial aid, or other benefit under the program; "

Paragraph 1, entitled Scope, of the compliance form is as follows:

"The State plan is being * * * and will continue to be administered in such manner that no person in the United States will, on the ground of race, color, or national origin, be excluded from participation in, be denied any aid, care, services, or other benefits of, or be otherwise subjected to discrimination in, the program under the State plan, * * *"

Paragraph 4 of the form reads:

"*Other Agencies, Institutions, Organizations, and Contractors*

The State agency will take such steps as necessary to assure that any other agency, institution or organization participating in the program, through contractual or other arrangements, will comply with the Act and Regulation."

Alabama interprets these provisions, particularly paragraph 4, as requiring it to guarantee that third party vendors such as private physicians, private nursing homes, or private institutions and church homes assuming the care of children, will completely integrate themselves. Therefore, Alabama reasons that if it signs the compliance form, it will be guaranteeing that no federal funds will be disbursed to third parties which maintain segregated operations and consequently it must discontinue payment of funds to those who still practice segregation. Alabama then points out that this would deprive needy people of their benefits for it could be and often is the fact that the only health or welfare facilities in any particular county are segregated. Furthermore, Alabama contends that it has no authority over private persons, health institutions and agencies and would have no authority to see that compliance was effected. Thus, it is contended that the State would be making a guaranty which it could not perform.

Alabama submits that the requirement in the compliance form that Alabama detail areas of segregation presently existing and outline the methods whereby the state agency will take steps to eliminate this condition supports its interpretation that the statement of compliance is a guaranty. It points out that during the hearings in Washington, Alabama inquired whether the state would be required to bring segregated facilities into compliance. A Government witness answered:

"This is correct. The state plan material is required to set forth the situation in the state, and the state plan and time limit, the purpose of that and the other regulation was to provide assurance that within a reasonable time the state would not only take steps it would accomplish compliance with the Civil Rights Act, but there is no specific deadline set forth in the regulation nor in the handbooks of the two bureaus."

Alabama also expresses the fear that the compliance form might well be construed as a contractual obligation and undertaking upon which action might later be brought against it by the Government. Therefore, it is argued, that

if Alabama did sign the form and it failed to bring third parties into compliance with the Civil Rights Act, the Government might or could elect to recover from the State agency all of the federal money pre-advanced to the State agency between the time of the signing of the assurance and the time when it may be finally determined that the State agency is unable to bring third parties into compliance.

Finally, section 602 of the Civil Rights Act which empowers HEW to issue rules and regulations provides expressly that any such rules, regulations or orders issued "shall ·be consistent with achievement of the objectives of ,the statute authorizing the financial assistance in connection with which the action is taken." Alabama contends that the regulation issued by the Secretary is not consistent with the objectives of the Social Security Act, namely to provide assistance to the poor, needy and aged. For example, Alabama asserts that the quoted statement above was added to section 602 to prevent, for one thing, the termination of school lunch programs in segregated schools.[6]

Thus Alabama argues, that what Congress meant by discrimination is that a state program receiving federal funds could not apply such funds only to white persons, eligible for assistance, but must operate for the benefit of Negro and white alike. Likewise, Alabama contends, that the purpose of the programs under consideration is to treat the sick, and to care for the poor, and so long as the treatment and care are provided for all, and Alabama has consistently and emphatically declared that it provides benefits under its state programs for both Negro and white, then there is no discrimination under such programs within the meaning of the Civil Rights Act. Therefore, the assurance that there must be desegregated waiting rooms, nursing homes, hospitals and institutions for child care goes beyond the scope of the Civil Rights Act.

In summary, it may be said that Alabama presents three primary arguments against the validity of the regulation. First, that such regulation, in requiring Alabama to sign a statement of compliance form, orders Alabama to either compel private institutions, homes, doctors, etc. to desegregate, which is an impossibility, or deal only with those private facilities which are desegregated and therefore deprive the needy people of Alabama of assistance. Second, that such regulation requires Alabama to enter into a contractual relationship with the Government and if such contract is breached the Government may seek restitution. Third, that the regulation is inconsistent with the objectives of the Social Security Act.

The statement of compliance which the regulation requires Alabama to submit is an assurance that Alabama will operate its state programs on a non-discriminatory basis. The statement of compliance must also identify the areas where racial discrimination is practiced in the administration of the state programs and in the facilities used in these programs and describe proposals for the elimination of such discrimination. Requiring the state agency to submit a plan of operation for

---

**6.** Alabama relies on the following assertion by Senator Pastore:

> "Let me advise Senators that the failure of a district court to desegregate the schools will not jeopardize the school lunch program; it absolutely will not. Even if a community does not desegregate, that will not jeopardize the school lunch program—unless in that particular school the white children are fed, but the black children are not fed; and I refer Senators to page 33 of the bill, which states very, very clearly: 'which shall be consistent'—in other words, the orders and rules—'shall be consistent with the achievement of the objec-

tives of the statute authorizing financial assistance.'
> "We have a school lunch program, and its purpose is to feed, not to desegregate the schools; therefore, that would not be consistent.
>   \*       \*       \*       \*       \*
> "So we must remember that the shutting-off of a grant must be consistent with the objectives to be achieved. A school lunch program is for the purpose of feeding the school children. If the white children are fed, but the black children are not fed, that is a violation of this law."
> 110 Cong.Rec. 13936 (June 19, 1964).

its state programs which are assisted by federal funds is normal procedure. Indeed, it has been the traditional procedure. In fact the Social Security Act places the responsibility of formulating and implementing a plan on the state agency, and requires reports from the state agency regarding this performance. A plan must even be submitted and approved by the Secretary before funds are received. Hence the requirement to submit an assurance form is merely an adaptation of the standard federal-state arrangement by which a state qualifies for federal welfare assistance.

The Secretary has consistently and repeatedly stated that the assurance form is not a guaranty that Alabama will force or compel third parties to desegregate. In its brief and on oral argument the Secretary stated that the assurance form merely commits Alabama to use its best efforts to eliminate racial discrimination, and obligates the Alabama Department to assume the responsibility for taking reasonable steps to eliminate discrimination in facilities and services provided by third parties. Hence, all the Secretary is asking of the Alabama Department is "to try to do something." It has been suggested that such reasonable steps could include persuasion, negotiation and seeking new facilities which would operate on a non-discriminatory basis.

On oral argument the Attorney for Alabama expressed amazement and unbelieving surprise at the statements of the Government counsel that all Alabama had to do was try. Through its counsel, Alabama expressed the thought that such an attitude did not prevail with the Secretary and other high Government officials, that it had not been expressed before, and in the opinion of state counsel, such an attitude would not long endure. However, the Government's interpretation of the assurance form and the expressions of counsel on oral argument are not without foundation. In proceedings before the Commissioner it was stated that the assurance:

"does not bind the State of Alabama or any of its agents, employees or officers

to be a guarantor that care or services to applicants or beneficiaries under a program to which this submittal applies will not be given on a separate, segregated or other discriminatory basis on the ground of race or color."

The Secretary in ruling on Alabama's objection to filing an assurance made the following statements:

"No one has suggested that it [the State] can compel private parties to provide services to Federally-assisted beneficiaries without discrimination. Our Regulation under Title VI is based upon the premise that most of those providing such services can be persuaded to provide them nondiscriminatorily and to the extent they will not, that Federal funds should not be paid to help perpetuate such discriminatory practices against innocent beneficiaries.

Alternate, acceptable services should be found and developed."

Moreover, the record discloses a willingness on the part of the Secretary to accept assurance from the State in language different from that used in the suggested form so long as the spirit and purpose of such assurance are in accord with the expressed national policy of non-discrimination.

We hold that the regulation only requires what the Secretary has so often stated that it requires, namely that Alabama assume the responsibility and make a good faith effort toward eliminating racial discrimination in its statewide federally assisted welfare program. The assurance form is not a guaranty. Nor can it be interpreted to be a contract. If in the future it is determined that Alabama is not making a good faith effort, the statement of compliance cannot be used as the basis of a lawsuit by the Federal Government in order to recover federal money already received and expended by Alabama for its state programs under the Social Security Act. We consider this interpretation to be the position of the Secretary. In any event, our holding and conclusion in this opinion is and will

be as binding on the Secretary as it is upon the State of Alabama. Such was the unequivocal and positive assurance of Government counsel on oral argument and we have no reason to doubt such assurance. The briefs of the Government amply support such assurance.[7] The fears and apprehensions of the State of Alabama should be allayed. The State should now proceed to administer its program to alleviate the suffering and despair of those citizens for whom these beneficent and benevolent programs were designed to help, free of halting fear, distrust and apprehension. Furthermore, if in the future, the Secretary determines that the Alabama Department has failed to make a good faith effort to implement the national policy of non-discrimination in accordance with the views herein expressed, such finding is certainly reviewable by the courts.

■■ We find no merit in Alabama's contention that the regulation is inconsistent with the objectives of the Social Security Act. Under Title VI of the Civil Rights Act, HEW is charged with the responsibility of eliminating racial discrimination in the great variety of welfare programs throughout the nation that are assisted by Federal funds. Such discrimination prohibited by the Civil Rights Act surely includes the practice of providing services to Negroes and whites on a separate but equal basis solely on account of their race. Consequently, Alabama cannot contend that it is not discriminating within the meaning of the Civil Rights Act when it admittedly provides some benefits to Negroes in a

7. The following are excerpts from the Government's initial brief filed in this Court:

"This litigation does not involve the validity of application of the HEW regulation to particular third-party situations or the institution of administrative proceedings for failure by Alabama to take action against particular third parties. Instead, what is at stake in this litigation is only the general question whether the Alabama Department is obliged to assume any responsibility to take reasonable steps to eliminate racial discrimination in facilities and services provided by third parties."

\*        \*        \*        \*        \*

"The limited question to be decided by this court is whether HEW can lawfully require the Alabama Department to assume some responsibility for the racial discrimination practiced by third parties in connection with performing services under the state welfare program, or to state the question conversely, whether the Alabama Department is entitled to disclaim *all* responsibility for racial discrimination of these facilities and institutions.

"*Second*, It must be recognized that the HEW regulation does not require the Alabama Department to eliminate racial discrimination practiced by third parties at the risk of having all funds terminated or the assurance breached. What it is asking the Alabama Department to assume is some responsibility for the elimination of racial discrimination practiced by third parties. It is asking the Alabama Department to *try* to do something. Moreover, it is not asking the Alabama Department—any more than it asked all 49 other state welfare departments—to attempt to accomplish something where it has no power to do so and there is no chance of success. The state agency knows which third parties perform services for welfare recipients; it is in a suitable position to report on the extent of noncompliance in such activities; and it can take many steps, including negotiations, to bring about an end to racial discrimination in those institutions and facilities. Indeed, some of these so-called third parties participate in the vendor payment program and, as stated in the Secretary's order, the Alabama Department 'either directly or through other state agencies \* \* \* negotiates or sets the fees which it will pay and \* \* \* is involved—as the Agency itself admits—in at least "helping" make arrangements for medical care "if requested to do so." ' [R. 28; A Vol. II, p. 293]." (Emphasis in original)

\*        \*        \*        \*        \*

"Thus, for these reasons we believe there is no merit to the Alabama Department's contention in that the HEW regulation requiring the submission of an assurance is unlawful because the submission of such an assurance would *commit it to trying to eliminate racial discrimination* in third party facilities that are used as an integral part of the welfare program." (Emphasis added)

manner different from whites, solely on the basis of their race. Furthermore, it is this type of racial discrimination along with all of its other invidious forms which HEW, in the administration of the Social Security Act and the state programs created thereunder, must play its role in trying to eliminate. We therefore believe that not only is striving to end racial injustice an objective of HEW under the Social Security Act, but in light of the deep concern of the Federal Government toward ending all discrimination, it is one of its primary objectives.

In discharging its responsibility HEW instituted the procedure of requiring the respective states to shoulder the burden of trying to eliminate racial discrimination. It has long been the policy that state programs receiving Federal funds under the Social Security Act must be approved by the federal agency. Consequently, one requirement for approval of state plans is that the State submit a statement of compliance whereby the State obligates itself to do its part toward ending racial discrimination by making a good faith, conscientious and sincere effort to do so. We find this procedure of submitting an assurance form to be particularly appropriate because it conforms to the basic structure of the welfare statute and regulations initially establishing the assistance programs.

The sample assurance form issued by HEW of which a portion was quoted earlier, is indeed a sample. The parties are free to draw up another assurance form in which the wording would, perhaps, be more acceptable to Alabama. We make no effort at suggesting the form it should take. We merely hold that the regulation requires the State to identify the areas where racial discrimination is practiced in its programs, commit itself to assuming the responsibility for making a good faith, conscientious and sincere effort to eliminate such racial discrimination and outline the methods by which it plans to go about that task.

For the foregoing reasons we find the regulation issued by the Secretary valid.[8] Since Alabama is presently in a state of non-compliance with this regulation, the validity of the order of the Secretary terminating funds to the Alabama Department must be upheld. However, in the interest of justice, issuance of our judgment is stayed for 30 days from the date of the release of this opinion in order to afford the parties an opportunity to eliminate their controversies and to proceed in accordance with this opinion. See Whitney Nat'l Bank in Jefferson Parish v. Bank of New Orleans & Trust Co., supra. Our review of the record convinces us that neither the Federal Government nor the State of Alabama desires to pursue a course of action which is contrary to national policy resulting in a loss of the funds involved in this litigation. It is assumed, and devoutly to be hoped, that both Governments will fully cooperate and solve the impasse which has developed before the expiration of the stay herein ordered and directed; and that Alabama will have submitted an adequate statement of compliance in accordance with this opinion.

The order and judgment of the district court granting a preliminary injunction is vacated and set aside. The order of the Secretary will be enforced in accordance with the views herein expressed.

8. Such conclusion is based not only on our finding that the State of Alabama's objections to the regulation issued by the Secretary are without merit but also upon our finding that the Secretary in issuing such regulation was clearly acting within its rule-making power conferred upon it by statute. S,E.C. v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1575, 1760, 91 L.Ed. 1995 (1946); National Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1942); Phelps Dodge Corp. v. N.L.R.B., 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1940); American Telephone & Telegraph Co. v. United States, 299 U.S. 232, 57 S.Ct. 170, 81 L.Ed. 142 (1936).