**Emmett PLAYER et al., Plaintiffs,**

**v.**

**STATE OF ALABAMA DEPARTMENT OF PENSIONS AND SECURITY et al., Defendants,**

**United States of America, Amicus Curiae.**

**Civ. A. No. 3835-N.**

United States District Court,
M. D. Alabama, N. D.

Aug. 8, 1975.

Howard A. Mandell and Joseph J. Levin, Jr., Montgomery, Ala., for plaintiffs.

Clyde P. McLendon, Asst. Atty. Gen. of Ala., Montgomery, Ala., for State of Ala., Dept. of Pensions and Security and Julia J. Oliver.

Thomas W. Thagard, Jr., Smith, Bowman, Thagard, Crook & Culpepper, Montgomery, Ala., for Brantwood Children's Home.

Ewell C. Orme, Troy, Ala., for Ala. Baptist Children's Home and R. H. Shirey.

Morgan Reynolds, Reynolds & Reynolds, Clanton, Ala., for Alabama Sheriffs' Boys Ranch and Don Acton, its administrator.

Jack Crenshaw, Crenshaw & Minor, Montgomery, Ala., for Presbyterian Home for Children and James Gabbie, its president.

Thomas S. Lawson, Jr., Capell, Howard, Knabe & Cobbs, Montgomery, Ala., for United Methodist Children's Home and Richard I. Kirkland, its executive director.

Joseph D. Phelps, Robison, Belser, Brewer & Phelps, Montgomery, Ala., for Gateway, Inc., and Mary Edna Porter, its executive director.

Ira DeMent, U. S. Atty., and Kenneth E. Vines, Asst. U. S. Atty., M.D.Ala., Montgomery, Ala., and Miriam R. Eisenstein and Robert J. Wiggers, Attys. Civil Rights Div., Dept. of Justice, Washington, D. C., for the U. S., amicus curiae.

## MEMORANDUM OPINION

JOHNSON, *Chief Judge.*

In this civil action, plaintiffs contend that the named plaintiffs, Emmett Player, Price Dwayne Coefield, and Charles Scott, are members of a class of black children in Alabama who have been discriminated against by the Alabama Department of Pensions and Security and six child-care institutions in the state. Named as defendants are the Alabama Department of Pensions and Security (hereinafter DPS) and its Commissioner[1] and the six institutions, Alabama Baptist Children's Home, Presbyterian Home for Children, United Methodist Children's Home, Alabama Sheriffs' Boys Ranch, Brantwood Children's Home, and Gateway, Inc., along with the director or superintendent of each institution. The latter two institutions have entered into consent decrees approved by the Court, and there are no unresolved claims against those defendants. During the initial stages of the case, the Court appointed the United States as amicus curiae with full rights of a party. After very extensive discovery, the case is now submitted to the Court on depositions, exhibits, and briefs.[2]

1. The original defendant-Commissioner, Ruben King, left office during the pendency of this action. His successor, Julia J. Oliver, has replaced King as a defendant. See Fed. R.Civ.P. 25(d).

2. The record in this case is massive. It consists of scores of depositions, many of them conducted over several days and filling multiple volumes, and thousands of pages of exhibits, data cards, and computer print-outs.

Pursuant to Rule 52(a), Federal Rules of Civil Procedure, the Court now enters this memorandum opinion containing its findings of fact and conclusions of law.

*Class Action*

The Court finds that this case is maintainable as a class action, the requirements of Rule 23, Federal Rules of Civil Procedure, being satisfied. The evidence establishes that there exists, and the named plaintiffs are part of, a class of black children who have been, and who will be, in need of the services provided by DPS and the defendant homes.

*Summary of Claims*

The contentions of the plaintiffs will be analyzed in detail in the course of this opinion but can be stated generally at the outset. Plaintiffs claim that DPS has discriminated against them and their class by a practice of segregated referrals to the child-care institutions in the state, provision of foster care in segregated settings, failure to ensure that the child-care institutions it licenses operate on a nondiscriminatory basis and failure to provide adequate foster care facilities for blacks. Plaintiffs further assert that DPS has discriminated against them and their class in its assistance to county courts and other agencies in placing children in child-care facilities and in its failure in general to discharge its duties toward black children on a level commensurate with the discharge of those duties toward white children. These practices are alleged to violate rights guaranteed the class plaintiffs by the Constitution and certain laws of the United States.

The defendant institutions and their officers are alleged to have rejected black referrals on the basis of race, to have applied more stringent standards of admission to blacks than whites, to have employed segregated sources of referrals, and to have failed to make their services available to persons likely to refer black children—all in violation of the Constitution and laws of the United States.

In addition, DPS and the defendant homes are alleged to have engaged in a conspiracy to deprive plaintiffs of rights secured by the Constitution.

*Department of Pensions and Security*

The Department of Pensions and Security is an agency of the State of Alabama. The DPS has the general duty to develop and administer the state's welfare program. Particularly relevant to this case is its duty to "[s]eek out, through investigation, complaints from citizens, or otherwise, the minor children in the state who are in need of its care and protection and . . . as far as may be possible, through existing agencies, public or private, or through such other resources, aid such children to a fair opportunity in life." [3] The DPS is also designated as the agency to administer federal welfare funds in the state,[4] and in fact administers many millions of federal welfare dollars each year.[5]

The DPS has virtually no contact with individual aid recipients. The client contact and actual casework are carried out by DPS county offices which operate "in accordance with the rules and regulations of the state department . . . ." [6]

The DPS is a complex bureaucracy with a highly structured division of duties and authority. The policies involved in this case are developed by the

One litigant estimates, in brief, that over one hundred thousand pages of testimony and documents have been offered in evidence.

3. Ala.Code, tit. 49, § 17(7)(10) (1958).

4. *Id.*, § 17(7)(5).

5. For a description of DPS funding and programs, see *Whitfield v. King*, 364 F.Supp. 1296 (M.D.Ala.1973) and *Gardner v. State of Alabama*, 385 F.2d 804 (5th Cir. 1967), *cert. denied*, 389 U.S. 1046, 88 S.Ct. 773, 19 L.Ed.2d 839 (1968).

6. Ala.Code, tit. 49, § 17(9) (1958).

Bureau of Family and Children Services. The Bureau of Field Services has the duty to supervise the activities of the county departments to ensure that the policies of the state department are carried out. This supervision is accomplished through field specialists who are assigned a number of county offices to visit and inspect. At the close of discovery in this case, a number of vacancies in field specialist positions prevented adequate supervision by the DPS.

The DPS is the principal child-placing agency in the state. It has, through its various programs, contacts and case files on several hundred thousand Alabama children. As noted above, the DPS has the statutory duty to come to the aid of children in need of its services. It is charged with the responsibility of discharging this duty through financial assistance, protective services and, when necessary, the institution of dependency proceedings for the purpose of removing a child from the adverse environment found to exist in its home. When a child is removed from the home, or is otherwise without a suitable home, the DPS county worker considers a number of possible placement alternatives. It is this placement of children outside the home that is the central focus of this case.

A considerable portion of the testimony submitted in this case deals with the place of institutional care[7] in the overall range of placement possibilities. There appears to be general agreement among those testifying that placement of a child in an institution such as those operated by the defendant homes is of relatively low desirability. Ideally, the problems which necessitate DPS intervention can be solved without removing the child from his parents' home. If this is not possible, and the child must be removed, the evidence reflects substantial agreement that the priority of possible placements is normally this: (1) the home of a close relative, (2) a non-relative foster home, (3) a group home (a single unit facility with fewer than ten children), (4) institutional care, (5) training ("reform") school. As with most social work "rules," this sequence is not applicable unvaryingly, and for children with certain backgrounds and problems the preferences may be different. Nevertheless, this priority list does serve as an indicator of the relative desirability of the various placement possibilities.

The evidence demonstrates that the percentage of the state's black children in need of DPS services is at least as great as the percentage of white children. There is nothing to indicate that there is any substantial qualitative or quantitative difference in the types of services required by black and white children.[8] In particular, there is no evidence that a substantially smaller proportion of black children are in need of institutional care. At the time this action was commenced, of the over 800 children in child-care institutions in the state, only about five percent were black though blacks constitute over thirty percent of the state's population.

7. There are various types of child-care institutions. Alabama law defines an institution as a facility designed to house and care for more than ten children unrelated to the operator. Ala.Code tit. 49, § 84(2)(5) (Supp.1973). The remaining defendant homes each have a capacity in excess of 75. Pursuant to the modern social work concept, the homes are organized in a "family cottage" pattern, with eight to twelve children living with houseparents in separate homelike units which are part of a single campus. The goal of the institutions is to operate the individual cottages in a manner so that, to the greatest extent possible, they will have the attributes of a natural-family home.

8. There is some testimony in the record that cultural traditions among blacks result in a lesser need among black children for extra-family placement. This theory, that blacks "take better care of their own," was rejected by the testifying experts. It is not necessary to a decision in this case to accept or reject the theory, for no one claims, and there is no evidence that reflects, that this asserted cultural difference accounts for the wide disparity in institutional service to whites and blacks.

The gross underrepresentation of the plaintiff class has had several deleterious effects on black children for whom, because of their particular backgrounds, child-care institutions are the placement of choice. Referring to the placement priorities discussed above, the unavailability of institutional and group care has meant that alternative placement must be found above (single family foster care) or below (training school). With respect to the general priorities, a suitable foster home has been sought for most children for whom institutional care is indicated but such a home has not been found. For many black children, the absence of institutional care results in placement in an inferior foster home situation that would not be accepted for a white child. The evidence contains numerous examples of black children placed with feeble or incapacitated great aunts and great-grandmothers receiving old-age pensions. The DPS state officials concede the inappropriateness of such placements. There are other cases of black children moving from unrelated home to unrelated home, with each subsequent home being approved for foster care payments. In most of these cases, it is clear from the case files that the inferior foster care placements are necessitated by the absence of institutional care opportunities.[9]

The absence of institutional care for black children also results in a disproportionate rate of commitment of blacks to the state training schools. Children over twelve years of age who are adjudicated delinquent are subject to commitment to these schools. An adjudication of delinquency can be predicated on a finding that a youth is guilty of conduct which would be considered criminal were he an adult. The evidence demonstrates a reluctance on the part of juvenile judges and probation staffs to commit a child to training school. Frequently, a child guilty of delinquent behavior will be adjudicated dependent and neglected if foster care or institutional care is available. Thus the unavailability of institutional care for blacks has resulted in a disproportionate rate of delinquency adjudications and commitments to training schools. The evidence establishes, for example, that named-plaintiff Emmett Player was illegally committed to training school at the age of ten and remained there long after he had achieved maximum benefits under the school's program, principally because no institutional placement was available.

Plaintiffs claim that DPS and the child-care institutions are both jointly and severally responsible for that scarcity of black placements in institutions and group homes. The claims against the defendant homes are discussed in a later portion of this opinion. As an introduction to the claims against DPS, however, it is necessary to note some statistics regarding child-care institutions in Alabama.

At the time of the commencement of this suit, there were approximately twenty group homes and child-care institutions in Alabama. Of these, two were all black, two were desegregated, and the remainder were all white. The all-black homes had approximately 40 residents; the all-white homes had approximately 750.

Pursuant to its duty to aid all children in need of its care, DPS is empowered to "[e]stablish and maintain homes or other agencies for the care of dependent, neglected, or delinquent minor children or contract with any approved agency or institution for the care of such children . . . ."[10] The DPS has not established any homes of its own but has

9. This discussion is not meant to imply that institutional placements are found for all white children who would benefit from such care. The evidence reflects a need in the state for substantially increased group and institutional care facilities. The evidence does establish clearly, however, that the burden of the scarcity of such facilities falls disproportionately heavily on black children.

10. Ala.Code tit. 49, § 17(7)(14) (1958).

chosen to discharge this duty through the second statutory alternative—contracts or other placement arrangements with private institutions. The DPS has no unilateral power to place children in any of the homes. It provides a service to the homes and children by referring apparently acceptable children to the homes, along with a social summary and case history of the child.

The evidence establishes that, at least prior to 1970, DPS was the source of the majority of referrals to virtually all the child-care institutions in the state. For some homes, DPS was the exclusive source. The evidence also clearly demonstrates that, almost without exception prior to 1968 and with limited exceptions since then, DPS maintained a policy and practice of referring black children only to all-black or already integrated homes. Given the small number of places in other than all-white homes, the segregated referral pattern worked a substantial detriment on members of the plaintiff class. In 1970, under prodding from the United States Department of Health, Education and Welfare, DPS announced that it would thereafter refer children only to homes in compliance with the Civil Rights Act of 1964, that is, homes which accepted children without regard to race.

The DPS considers a home to be in compliance with the Civil Rights Act when the home signs a declaration that it is in compliance. The DPS, either in discharge of its licensing function [11] or otherwise, does not make any investigation to determine whether the signatory homes actually operate on a nondiscriminatory basis. In particular, DPS has not seen fit to investigate actual compliance by those homes which remain all white long after the compliance declaration was signed.

The evidence also demonstrates that, notwithstanding the state directive to the contrary, numerous county offices continued to refer [12] children to noncomplying institutions. These referrals were sometimes open and direct, effected through a letter or telephone call from a DPS worker to a home. Often, however, the referrals were covert and circuitous, with the DPS worker enlisting a minister, family member, or probation officer to make the contact with the home, and the DPS social summary ending up in the home's case file.[13]

Even after various all-white institutions signed compliance statements, DPS workers in county offices referred very few blacks to these homes. A substantial portion of the few blacks referred had personal characteristics and back-

11. See the discussion of the DPS licensing activities in connection with the "state action" claim against the homes, *infra*.

12. Throughout the depositions taken in this case, there was considerable quibbling over what constitutes a "referral." In examining the evidence of post-1970 DPS contacts with noncomplying homes, the Court has considered a referral to be any DPS-initiated contact with the home for the purpose of making a particular child known to the home or inquiring regarding the possibility of acceptance of a particular child, as well as such a contact made by anyone acting as agent for a DPS worker.

13. These social summaries are of inestimable value to the homes. They are extensive discussions of the child, his physical and mental characteristics and defects. They contain a profile of his family, with descriptions of his parents and siblings, a summary of any intelligence or psychological tests of which the child was the subject, a description of any emotional or behavioral disorders, and an evaluative summary by the caseworker.

The homes rely heavily on the summaries in determining whether to reject a child outright or to investigate further. For the homes without any social work staff, the summary may serve as the sole basis for a decision to accept or reject a child. As the information contained in the summary is essential to the admission decision, the availability of the summary relieves the homes of the need to make background investigations of referred children. Often when a private party makes inquiry of a home regarding the placement of a child, the party will be directed to DPS for the preparation of a social summary.

grounds which made them unlikely candidates for acceptance by the institutions.[14] For its part, the DPS has made little or no effort to monitor referrals to determine whether referrals to nonsignatory homes have ceased and blacks are being referred to all-white signatory homes.

After denial of certiorari in *Gardner v. State of Alabama,* 385 F.2d 804 (5th Cir. 1967), *cert. den.,* 389 U.S. 1046, 88 S.Ct. 773, 19 L.Ed.2d 839 (1968), the DPS signed a certificate of compliance with the Civil Rights Act of 1964. In *Gardner,* the Fifth Circuit held that by signing the compliance statement, the DPS would obligate itself to make a diligent, good-faith effort to persuade private parties with whom it dealt to operate on a nondiscriminatory basis. 385 F.2d at 815. There remain in the nonsignatory homes numerous children in DPS custody for whom the DPS continues to provide service. The efforts of the DPS to persuade these homes to desegregate have been for all practical purposes nonexistent.

These factual findings lead to several legal conclusions. Referrals of children to homes by the DPS and the associated casework services and summaries are valuable benefits that the state confers on needy children. Having undertaken to render these services to children, the state cannot administer the referral program in such a manner that black children are deprived of equal opportunities and benefits. See *Missouri ex rel. Gaines v. Canada,* 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208 (1938); see also *Hawkins v. Town of Shaw,* 437 F.2d 1286 (5th Cir. 1971), *aff'd en banc,* 461 F.2d 1171 (1972); *Hadnott v. City of Prattville,* 309 F.Supp. 967 (M.D.Ala. 1970). Referral of proportionately fewer and less "desirable" blacks to historically all-white homes denies the plaintiff class equal benefits under the DPS program, in violation of the Fourteenth Amendment and Section 601 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.[15]

The DPS is authorized and directed by state law to provide institutional care for children in need of such care. It has done so by contract and other placement arrangements with child-care institutions. In failing to provide institutional care for black children, either through its own facilities or through contract, to the same extent that it does for white, the DPS has denied the plaintiff class the equal protection of the laws.

The continued provision of DPS services to the child-care institutions [16] in the state which operate on

14. The minimum standards for acceptability are similar for most of the homes. They accept children of school age—six to eighteen—though the chances of acceptance diminish with age over fourteen. The child must be of at least low-average intelligence (I.Q. of approximately 85 or above) and have no pronounced learning disabilities. None of the homes have their own special education programs; their policy regarding the acceptance of children in need of such programs depends on the existence of special education classes in the local public school system. To be acceptable, a child cannot have any severe psychiatric, emotional, personality, or physical disorders. Behavioral problems ("acting out") are a detriment to a child's acceptability, particularly where the problems involve excessive sexual activity or unmanageability. An adjudication of delinquency is a detriment at some homes.

15. "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

16. There is considerable discussion in the depositions and briefs regarding whether the assorted DPS services provided are services to the homes or to the resident children. It is clear that such a distinction can be made, with significant legal and constitutional consequences. *See, e. g., Meek v. Pittenger,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975). The testimony in this case establishes clearly, however, that the provision of DPS case summaries and other background material, see note 13 *supra,* in connection with a referral is a substantial direct benefit to the home as well as to the child. Cf. *Bob Jones University v. Johnson,* 396 F.Supp. 597 (D.S.C.1974).

a segregated basis constitutes a violation of the Fourteenth Amendment rights of the plaintiff class to the equal protection of the laws. See *Norwood v. Harrison,* 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973); *Wright v. City of Brighton,* 441 F.2d 447 (5th Cir. 1971). In this connection, it is clear that a home's declaration of compliance is not sufficient to relieve DPS of its burden of assuring that its programs are carried out on a nondiscriminatory basis. The DPS is under a legal duty to make a determination of actual compliance before giving and continuing to give a home assistance.

The DPS services to children in DPS custody in noncomplying institutions are directly beneficial to the children. Unlike the social summaries discussed above, these services (vacation planning, etc.) are not essential to the operation of the homes and the benefit to the homes is secondary and indirect. The provision of these services to children in DPS custody is not so serious an entanglement of the state with the discriminatory policies of the homes as to require disengagement. See generally *Norwood v. Harrison, supra,* 413 U.S. at 464 n. 7, 93 S.Ct. 2804; *Meek v. Pittenger,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975).

Plaintiffs and amicus curiae also raise a much broader claim against DPS. The bulk of the testimony in this case deals with the question of the failure of the DPS to provide institutional care for blacks as a class and the resulting harm to black children. The assertion is also made that the DPS has engaged in a practice of failing or refusing to intervene with early childhood protective services for black children. As support for this contention, plaintiffs and amicus point to the case files of the named plaintiffs and other black children submitted in evidence. A study of these files reveals that they could support a finding that the DPS has failed to carry out its statutory duty with respect to those black children. That finding would be of constitutional significance only if it were accompanied by a finding that there are no similar failures or refusals in the cases of white children (or at least that the rate of nonintervention for blacks was substantially greater than that for whites). The evidence relevant to this point establishes that the rate of DPS-instituted neglect proceedings for black children is approximately equal to the percentage of blacks in the state's population. Amicus argues, primarily from census data, that the need for such intervention is greater among blacks than among whites, so that the correlation between black neglect proceedings and black population actually demonstrates a lower quality of service to blacks. The Court finds the evidence inadequate to support this theory and finds no basis for the broader scale relief sought.

*Homes*

Plaintiffs and the United States as amicus curiae advance a number of claims against the defendant homes, alleging violations of 42 U.S.C.A. §§ 1981, 1983, 2000d and 3604, and of 31 U.S.C. § 1242. Before discussing these claims, however, it is necessary to address the issue of plaintiffs' standing to raise them.

The parties have not discussed in detail the question of plaintiffs' standing; however, since it affects the jurisdiction of the Court, the issue must be resolved. There remain four defendant homes: Alabama Baptist Children's Home, Presbyterian Home for Children, United Methodist Children's Home, and Alabama Sheriffs' Boys Ranch. Of the named plaintiffs, only one, Emmett Player, has been referred to and considered for admission by any of the defendant institutions; his referral was rejected by the Methodist home and the Boys Ranch. None of the named plaintiffs were referred to the Baptist home or the Presbyterian home. This fact raises an obvious question as to plaintiffs' standing to assert any claim against the Bap-

tist and Presbyterian homes, as all of the claims against the homes are based on alleged discrimination in admissions.

All of the plaintiffs' claims against the homes are founded on various civil rights statutes (or civil rights provisions in other statutes) enacted pursuant to the Thirteenth and Fourteenth Amendments. The Supreme Court has at various times indicated that these remedial statutes are to be enforced liberally; in particular, standing to sue under these statutes is to be treated as being coextensive with the Article III jurisdiction of federal courts. E. g. *Trafficante v. Metropolitan Life Insurance Company,* 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972). This Court has noted that "[p]articularly in these civil rights cases . . . standing doctrine will not be used to delay still longer the operation of constitutional commands . . . or to undermine the effectiveness of the class action device in this area." *Marable v. Alabama Mental Health Board,* 297 F.Supp. 291 (M.D.Ala.1969). These decisions establish that standing exists under the civil rights statutes when the "concrete adverseness" case or controversy test is met. See *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

In this case, plaintiffs allege that the Baptist and Presbyterian homes have long-standing and obvious policies of racial exclusion; plaintiffs do not act for themselves in referrals, but the referrals are made on their behalf by others bound by law not to refer children to these noncomplying homes. Plaintiffs further allege that, as a result of these discriminatory admissions policies, they have been denied institutional care and have been placed in less desirable situations. This is a sufficient allegation of injury in fact. See *Sierra Club v. Morton, supra.*

In the face of the apparent racial exclusiveness of the homes, and the legal restrictions on referrals by DPS, it would be unreasonable to deny standing to plaintiffs because of their failure (or the failure of someone acting on their behalf) to take the allegedly futile step of making application. See *Hailes v. United Air Lines,* 464 F.2d 1006 (5th Cir. 1972); *Cypress v. Newport News General and Nonsectarian Hospital Association,* 375 F.2d 648 (4th Cir. 1967); see also *Smith v. YMCA,* 316 F.Supp. 899 (M.D.Ala.1970), *aff'd* 462 F.2d 634 (5th Cir. 1972). Accordingly, the Court finds and concludes that plaintiffs have standing to raise the discrimination-based claims against each of the defendant homes. The Court has certified that this action is maintainable as a class action and that the named plaintiffs are proper class representatives. That being true, and with standing established, it is clear that the class claims can properly be determined whether or not the named plaintiffs prevail on their individual claims. *Huff v. N. D. Cass Company,* 485 F.2d 710, 712 n. 4 (5th Cir. 1973) (en banc).

*Discrimination By Homes*

As noted above, each of the claims against the defendant homes is predicated on alleged discrimination in admissions. Plaintiffs begin their proof of this discrimination with a stark, undisputed fact—as of the commencement of this action, none of the defendant homes had ever admitted a black child. It is generally true that "[i]n the problem of racial discrimination, statistics often tell much, and Courts listen," *Alabama v. United States,* 304 F.2d 583, 586 (5th Cir. 1962), *aff'd,* 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112 (1962), and that proof of the total absence of blacks can be found to establish a *prima facie* case of discrimination. This case does not deal with voters or jurors or persons with widely-held and fungible job skills, however, and the statistics alone are not conclusive, given the delicate subjective judgment that must accompany admissions decisions. Plaintiffs point to a variety of other evidence sup-

porting their conclusion that each of the defendant homes maintains a discriminatory admissions policy.

The Baptist home admits that it does not accept black children. Two blacks have been referred to the home in recent years, and they were both rejected.

The Presbyterian home denies that it has a discriminatory admissions policy. Since 1964, it has had three black referrals, which were rejected. The home has not signed a statement of compliance with the Civil Rights Act of 1964, despite the fact that the reduction of referrals by the DPS resulting from nonsignatory status has reduced the number and quality of referrals to the home. The home has no blacks on its board of trustees, no black house-parents, and no black social workers or office personnel. There is no evidence of any planning or counseling by the home to prepare for the psychological and sociological impact of black admissions. The director of the home testified that he would recommend against the admission of any blacks.

The Boys Ranch has signed a statement of compliance with the Civil Rights Act of 1964, and professes to accept referrals without regard to race. The Ranch director does not keep records of rejected referrals, but estimates that about 22 blacks have been rejected. None of the blacks referred have been invited to the Ranch for a pre-placement visit. As noted below, the Ranch is a project of the Alabama Sheriffs' Association, and sheriffs are expressly afforded the right to refer children to the Ranch. None of the state's black sheriffs are members of the association. The Ranch has no blacks on its board of trustees, and has no black house-parents or employees in responsible positions. Like the Presbyterian home, there is no evidence that the Ranch has undertaken any efforts to prepare staff and residents for the admission of blacks.

The director of the Methodist home testified that prior to 1971 the home had a policy of limiting admissions to white children. In March of 1971, the home signed a form declaring that it was in compliance with the Civil Rights Act. Approximately fifteen black children were referred to the home between August of 1971 and the close of discovery in this case; none of these were admitted. Two of these black children were not rejected, but their files were held in abeyance because apparently successful foster home placements had been made. The home has four blacks on its board of trustees. There are no black house-parents, social workers, or administrators; a black man has been employed by the home as a part-time tutor for the residents. Members of the home's social work staff have attended a social work conference dealing with the relationship between black children and white social workers. After the close of discovery in this case, two black children were accepted at the home.

Of the approximately fifteen blacks referred to the Methodist home, several appear to have met the minimum standards for acceptance but were rejected. These case files were discussed in detail in depositions and briefs. The testimony establishes that, in considering these referrals, the home applied a more stringent standard than that applied to white children, though for noninvidious reasons. The home desired the first blacks admitted to be more than marginally acceptable, having determined that the added pressure of being the first black in the home could best be borne by a child who had no significant emotional problems. The home appears to have rejected one or two otherwise qualified black children who failed to meet this more stringent standard.

The evidence presented and the reasonable inferences arising from the evidence established that defendants Baptist home, Presbyterian home, and Boys Ranch maintain a policy and practice of accepting only white children. The Court finds that prior to 1971, the Methodist home had a policy of refusing

to accept black children. After signing the compliance statement, the home dropped its policy of complete exclusion of blacks and began slow preparation for desegregation. During the period between March of 1971 and the commencement of this action, the Methodist home rejected some black referrals through application of a more stringent standard of admission than that applied to whites. The post-suit admission of blacks was not a sham act to avoid liability or to fabricate mootness but indicates an end to the home's practice of racial discrimination in admissions.

*Section 1983*

Plaintiffs' initial claim against the homes is that each of them has, under color of state law, deprived plaintiffs of the equal protection of the laws through their discriminatory admissions policies. The evidence and contentions are such that the three religious homes can be treated together for purposes of this claim. The Boys Ranch requires separate treatment.

Plaintiffs and amicus curiae advance several "state action" theories in support of the claim that the homes act under color of state law.

A. *Licensing and Regulation.* All child-care institutions in the state are required to be licensed by DPS. The comprehensive licensing standards are set out in Title 49, Section 84, *Code of Alabama,* (Supp.1973). This provision requires that, before a license is issued, DPS must investigate the physical facilities of the prospective licensee and the qualifications and character of the persons who will have care of the children. The license is valid for two years and is renewable only after reexamination of the home and its operators.

The initial and renewal examinations are conducted to measure compliance with standards required to be established by DPS. These standards relate to the qualifications of the operators; the ratio of staff to children; the financial stability of the institution; the conformity of the facility with building, fire, and health codes; the availability of adequate food, clothing, education, and recreation; the discipline of children, and the maintenance of specified records. The licensee is required to make periodic reports to DPS, generally concerning demographic data on its residents. In addition, DPS is given a right of entry at all reasonable times to make necessary inspections. In short, Alabama law provides for detailed regulation of most phases of the licensee's operation.

None of the regulations or licensing requirements relate to the admissions practices of the homes. None define the types of children which can or cannot be accepted. The granting of the license, or the enforcement of the regulations, cannot be said to encourage or foster the discriminatory admissions policies. Under the principles of *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), the issuance of the license and the enforcement of the licensing regulations do not, taken alone, make the actions of the homes state action.

B. *Public Function.* Plaintiffs and amicus argue that, at least since the passage of Alabama's first child welfare law in 1919, the state has recognized its responsibility to care for dependent, neglected, and delinquent children. That recognition is manifested in part by the duty imposed on DPS to "seek out" such children and aid them to a fair start in life. In furtherance of that goal, Title 49, Section 17(7)(14), *Code of Alabama,* empowers DPS to

> [e]stablish and maintain homes or other agencies for the care of dependent, neglected, or delinquent minor children or contract with any approved agency or institution for the care of such children, and, also, receive and care for dependent, neglected and delinquent minor children committed to its care, make a careful physical examination and, if possible, a mental examination of every such child, investigate in detail the per-

sonal and family history of the child and its environment, and place such children in family homes or in approved suitable institutions operating in accordance with the provisions of this chapter and supervise such children however placed.

Though the state is thus authorized to do so, it has established no institutions for dependent and neglected children. It has chosen to discharge its duties to such children through placements in the defendant and similar homes. Plaintiffs conclude that the homes are thus discharging a recognized public function, which brings their activities within the "state action" ambit.

The public function-state action theory developed in the election context, *Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944); *Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 684 (1953), has been extended to municipal recreation facilities. *Evans v. Newton,* 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966); *Smith v. YMCA,* 462 F.2d 634 (5th Cir. 1972). The theory holds that when the state delegates the performance of essential governmental functions to an otherwise private entity, the performance of that function cloaks that entity with the aura of the state, and the entity's actions in discharging that function are taken under color of law. The limits of the theory were recently explored by the Supreme Court in *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). *Jackson* was a Pennsylvania case involving a procedural due process challenge to the termination of plaintiff's electric service. In the course of its opinion, the Court discussed the applicability of the public function test to a public utility company. The Court indicated that the test is whether the power exercised is one "traditionally associated with sovereignty" or "traditionally the exclusive prerogative of the State." *Id.* at 353, 95 S.Ct. at 455. In finding no state action, the court relied in part on the fact that "while the Pennsylvania statute imposes an obligation to furnish service on regulated utilities, it imposes no such obligation on the State." *Id.*

In this case, Alabama statutes do impose on DPS an obligation to furnish services to dependent and neglected children. The question remains what weight is to be given to the court's several reiterations of the limitation of the public function theory to activities "traditionally exclusively reserved to the State." *Id.* at 352, 95 S.Ct. at 454. The three religious homes point out that they were established and operating, performing the same functions they perform now, long before the state recognized any responsibility in the field of child care, and that at no time has the provision of such care been regarded as an exclusive state function. On the contrary, the homes argue, historically and currently, orphanages and child-care institutions have been operated chiefly by religious and other private charitable agencies.

Applying the approach of *Jackson* to the evidence in this case, the Court concludes that the actions of the defendant religious homes are not attributable to the state under the public function theory. In reaching this conclusion, the Court has carefully considered the decision of the Second Circuit Court of Appeals in *Perez v. Sugarman,* 499 F.2d 761 (1974). That decision, announced prior to *Jackson,* found the public function theory applicable to the actions of a private children's home under a statutory scheme essentially the same as Alabama's. The court held that a statute similar to Title 49, Section 17(7)(14), quoted *supra,* delegated to the home the performance of a public function, so that the home's actions in holding custody of a child were taken under color of state law. The court's analysis was a logical extension of pre-*Jackson* law; however, in light of *Jackson,* the current validity of the result is questionable and this Court declines to follow *Perez.*

C. *Symbiotic Relationship.* Relying on *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), plaintiffs and amicus contend that DPS "has so far insinuated itself into a position of interdependence" with the homes that the actions of the homes cannot be considered private and outside the scope of the Fourteenth Amendment. The evidence in this case fully establishes that there exists a substantial exchange of benefits between the homes and DPS. The homes provide a means for DPS to discharge its statutory duties without the financial and administrative burden of establishing state homes. The availability of DPS offices, caseworkers, and case files eliminates much of the screening and investigative work which the homes would otherwise be required to undertake as part of the admissions process. Through this exchange, each entity absorbs by the provision of services to the other what would otherwise be a considerable expense to the other. To that extent, there is unquestionably a "symbiotic relationship" between the homes and the DPS.

Finding an exchange of benefits does not automatically make the *Burton* result applicable here. See *Id.* at 725–26, 81 S.Ct. 856; *Moose Lodge, supra,* at 173, 92 S.Ct. 1965. *Burton* and its progeny in the Fifth Circuit, e. g., *Smith v. YMCA, supra; Wimbish v. Pinellas County,* 342 F.2d 804 (5th Cir. 1965); *Hampton v. City of Jacksonville,* 304 F.2d 320 (5th Cir. 1962), all involve common or successive interests in some real property, absent in this case. That distinction cannot be ignored. See *Moose Lodge, supra,* at 174–75, 92 S.Ct. 1965. All of the defendant religious homes' assets were purchased with their own assets or donated to them by private parties; none were purchased or contributed by the state. Compare *Burton,, supra,* at 723, 81 S.Ct. 856. The court concluded in *Burton* that because of their physical and financial relationships, the state and the private party involved were inextricable partners in a joint effort. The evidence in this case does not reach that level. The homes and the DPS cooperate closely in working toward a shared goal, but they are not so closely tied together as to be considered "joint venturers." See *Moose Lodge, supra,* at 177, 92 S.Ct. 1965. The homes are discrete entities, capable of existing totally apart from the state, and the state's involvement in their activities does not approach the level of entanglement that requires or justifies this Court's reaching the *Burton* result.

The ultimate question, as refined by *Moose Lodge* and *Jackson,* under any and all of these theories is whether the state, through licensing, regulation, assistance, or any other action, can be said to have sanctioned, fostered, encouraged or identified itself with the discriminatory admissions policies of the homes. Taking the evidence outlined above and adding the tax exemptions granted the homes by the state, see *Smith v. YMCA, supra,* the Court is unable to answer that question in the affirmative, and plaintiffs' claims against the religious homes under Section 1983 are due to be denied. See *Greco v. Orange Memorial Hospital Corp.,* 513 F.2d 873 (5th Cir.) *rehearing denied,* 515 F.2d 1183 (1975).

In addition to the evidence discussed above, the case of the Boys Ranch is complicated by its ties with the Alabama Sheriffs' Association. Cf. *Adams v. Miami Police Benevolent Association,* 454 F.2d 1315 (5th Cir. 1972). The association was organized for the purpose of sponsoring the Ranch. Part of the land on which the Ranch is located was donated by the association. The seal of the association appears on all of the Ranch's publications and contribution solicitation. There was testimony from Ranch and association officials that there is a conscious effort on the part of both to generate funds for the Ranch by associating it in the public mind with Sheriffs and the law enforcement process. Thus a ten dollar con-

tribution to the Ranch gains the contributor an honorary membership in the association.

On the other hand, there is no evidence that the association plays any significant role in the operation or policy-making of the Ranch. The Ranch is established as a corporation separate from the association. Sheriffs are members of the Ranch corporation *ex officio*, but this membership is essentially honorary and results in no active management functions. In particular, there is no evidence that the association has any role in setting admissions policies or making individual admissions decisions. Those decisions are made by a subcommittee of the board of trustees, which is required to have less than fifty percent sheriff members. In the most recent series of entanglement cases, involving the National Collegiate Athletic Association, the critical factor resulting in a state action finding was the fact that the particular policies and rules being challenged were established by committees on which state colleges had the dominant role. *See e. g., Howard University v. NCAA,* 510 F.2d 213 (D.C.Cir. 1975); *Parish v. NCAA,* 506 F.2d 1028 (5th Cir. 1975). That critical element is not present in the relationship between the Sheriffs' Association and the Boys Ranch; in light of its absence, the claim against the Ranch is controlled by the same principles as the claim against the religious homes.

*Section 1981*

Plaintiffs further contend that the defendant homes by denying their admission for reasons of race violated Section 1981, Title 42, United States Code. Section 1981 provides: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . ." It is clear that this section will support a claim against purely private conduct. See *Sanders v. Dobbs Houses, Inc.,* 431 F.2d 1097 (5th Cir. 1970). Plaintiffs claim that the defendant homes, in denying them admission on the basis of race, have denied them the right to make contracts protected by Section 1981. The principal defense of the homes to this claim is that the admission of a child to their homes creates no contractual relationship.

It is clear that Section 1981 creates no new body of contract jurisprudence and that the existence of a contract is to be determined through the application of traditional contract principles. *Cook v. Advertiser Co.,* 458 F.2d 1119 (5th Cir. 1972). The claim and defense in this phase of the case require the Court to venture into one of the more esoteric areas of contract law.

At the time a child is accepted, each of the homes enters into some form of agreement with the party having legal custody of the child placed. These agreements are generally brief and informal, outlining the home's undertaking to care for the child. Each of the agreements also contains a provision declaring that the placing party will abide by the home's regulations regarding such things as times of visitation with the child.

The legal analysis of these agreements under Alabama law begins with *Phillips v. Frederick,* 257 Ala. 283, 58 So.2d 584 (1951). The parents of Frederick entered into an oral agreement with Phillips under which Phillips would be given physical custody of Frederick and would care for and educate him. The agreement further provided that, should Phillips die before Frederick finished college, Frederick would be given $7,000 out of Phillips' estate. Phillips died, and Frederick sued to collect the $7,000. The estate defended on grounds that the agreement was void because there was no consideration and because it contravened public policy. Regarding the existence of consideration, the Alabama Supreme Court quoted with approval the following

language: "The surrender by the mother of all control of the child, and the services and companionship of the latter [constitute] valuable considerations . . . ." *Id.* at 286, 58 So. 2d at 587. The giving up of custody and the forbearance from exercising the right to the child's companionship and services are thus recognized as consideration under Alabama law.

However, a finding of consideration is not alone sufficient to find a contract. The agreement must create "a special right *in personam*, a right in the promisee against the promisor . . . ." *Corbin on Contracts*, § 4; see *Cook v. Advertiser Co.*, *supra*, at 1123 (Wisdom, J., concurring). The *Frederick* case and those there relied on all involved executed agreements, fully performed by one side. The court limited its holding to that situation:

> In the instant case the agreement was fully performed by the parent and child. Phillips, the deceased, received all that he bargained for. Although a contract by a parent to surrender the custody of a child to another in consideration of his promise to care for, rear, and educate it may not be binding when made because of the peculiar character of the duty and rights of the parent in respect to the child, and where the welfare of the child demands it, it is binding on the other party after the parent and child have, as here, fully executed their part.

257 Ala. at 287, 58 So.2d at 588. On several occasions, the Alabama Supreme Court has noted that child placement agreements are subject to the paramount interest of the state as *parens patriae*, and it is clear that a suit to enforce a placement agreement during its term would result in a decision based not on the agreement but on the court's view of the best interest of the child. See *Bureau of Catholic Charities v. Deakle*, 253 Ala. 471, 45 So.2d 163 (1950); *Campbell v. Sowell*, 230 Ala. 109, 159 So. 813 (1935). Thus the child placement agreements do not meet the most common conception of a contract—an agreement enforceable at law. *Corbin on Contracts*, § 3. In addition, because of the peculiar relationship between a parent attempting to place a child and a charitable institution accepting the child, the traditional concept of a contract as the embodiment of some bargain is difficult to apply. The evidence does not reflect that the forbearance of the person placing the child is the bargained-for consideration which induces the home to contract. See *Corbin on Contracts*, §§ 115–18.

This Court is aware that Section 1981 is to be interpreted broadly to effect the remedial purposes of the civil rights statutes. Nevertheless, relief under the statute is predicated on a finding of a denial of equal rights to make contracts. Upon the evidence presented, the Court finds no denials of such rights.

*Fair Housing Act*

Plaintiffs also contend that the actions of the homes in denying admissions on the basis of race violate the Fair Housing Act of 1968, 42 U.S.C. §§ 3601–19. Defendants interpose an initial procedural defense to this claim. The complaint in this case, as amended, though it claims violations of several federal laws, does not mention the Fair Housing Act. The claim under the Act was not formally proffered until the pretrial order in the case was prepared. All of the defendants object to this late inclusion and assert prejudice. As is discussed below, the principal question regarding the applicability of the Fair Housing Act to this case is a purely legal matter. The facts which would establish liability under the Act are the same as those developed in other phases of the case. Defendants had ample opportunity to discuss the legal question in briefs, and the Court finds that no prejudice would result from the inclusion of the Fair Housing Act claim. Upon consideration of the policies underlying

Federal Rules of Civil Procedure 15(b) and 16, the Court finds that this claim is properly raised. See *Wallin v. Fuller*, 476 F.2d 1204 (5th Cir. 1973).

The substantive portion of the Fair Housing Act, Section 3604, provides in part: ". . . it shall be unlawful [t]o refuse to sell or rent . . . or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race . . . ." Plaintiffs contend that the actions of the homes are covered by the "otherwise make unavailable" language. Defendants contend that the Act is not applicable to the admissions decisions of a private, charitable, child-care home.

It is unquestionable that the principal focus of the Fair Housing Act is the commercial housing market. Most of the Act's provisions relate to the "sale or rental" of housing, and the cases construing the "otherwise make unavailable" clause deal with activities related to the commercial housing market: zoning, mortgage financing, real estate associations and multiple listing services, etc. It is also clear from a survey of the debates on the Act that Congress had commercial housing as its focus in passing the Act. *See, e. g.*, 114 Cong. Rec. 4296 (1968).

The Court finds that it is unnecessary to resolve the question of the scope of the Act's coverage. Assuming for the moment that coverage extends to the facts of this case, plaintiffs have failed to meet the burden of proof on this claim.[17]

The Act contains three discrete enforcement provisions. A "pattern or practice" suit may be brought by the Attorney General without any administrative action or conciliation effort. 42 U.S.C. § 3613. Though the United States was made amicus curiae with full rights of a party in this case, it has not intervened as a plaintiff to file a pattern or practice complaint under Section 3613. The claim is raised by the private plaintiffs, who are authorized to bring such an action under Section 3610 or 3612. As none of the administrative exhaustion required by Section 3610 has occurred, plaintiffs' rights are assertable only under Section 3612.

A comparison of Sections 3612 and 3613 discloses the difference in their purposes and scope. Section 3613 is designed to provide broad-scale relief where a discriminatory housing pattern has created a problem of "general public importance." In such a case, evidence of individualized acts of discrimination is not required as the focus is on the discriminatory policy evidenced by the defendant's overall operation and its class-based result. *See, e. g., United States v. Real Estate Development Corporation*, 347 F.Supp. 776 (N.D.Miss. 1972). Section 3612 is designed to vindicate private rights violated by some identifiable act of discrimination. That section also contains a 180-day limitations period, which commences with the occurrence of the discriminatory housing practice. In order to prevail under Section 3612, plaintiffs must demonstrate some act of discrimination in the provi-

17. In a pattern or practice suit brought by the United States against a private children's home in Virginia, the district court found that the discrimination practiced by the home was within the coverage of the Act. *United States v. Hughes Memorial Home*, 396 F. Supp. 544 (W.D.Va., 1975). In addition to the policies and history of the various civil rights statutes, the court relied on the exception provided by Section 3607: "Nothing in this subchapter shall prohibit . . . any nonprofit institution . . . operated . . . by or in conjunction with a religious organization . . . from limiting the sale, rental or occupancy of dwellings which it owns or operates for other than a commercial purpose to persons of the same religion . . . unless membership in such religion is restricted on account of race . . . ." The court reached the logical conclusion that the existence of this narrowly-drawn exception indicates that the Act covers that which it does not except—a religious institution's noncommercial residential facilities occupied other than through sale or rental, and available to others than the operator's co-religionists.

sion of housing occurring after May 20, 1972. There is no record of any blacks referred to the Baptist home, the Presbyterian Home or the Boys Ranch after that date upon which the Court could rest a finding of discrimination. Careful study of the case files and depositions dealing with the Methodist home reveals no basis for a finding that, between May 20, 1972, and the commencement of this action, any black was rejected who would have been accepted were he white.

*Revenue Sharing Act*

Plaintiffs and amicus also claim that the discriminatory admissions practices of the homes violate the nondiscrimination provisions of the Revenue Sharing Act, 31 U.S.C. § 1242. Like the Fair Housing Act, the Revenue Sharing Act was not mentioned in any pleading and was belatedly raised. Unlike the Fair Housing Act claim, however, the issue of violation of the Revenue Sharing Act involves factual questions distinct from those developed in other phases of the case and requires a tracing of federal revenue sharing funds through DPS programs to determine if the homes are "recipients" of these monies. The Court finds that, in light of the course of discovery in this case, the defendant homes would be unduly prejudiced by the belated inclusion of this claim.

*Conspiracy: Section 1985(3)*

Plaintiffs contend that the homes have conspired with DPS to violate the constitutional rights of the plaintiff class, in violation of 42 U.S.C. § 1985(3). See *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). The gravamen of this claim is the fact that the homes accepted referrals from DPS county offices despite the fact that the homes knew that some of these referrals were made in violation of the DPS compliance assurances and the Civil Rights Act of 1964.

The elements of a claim under Section 1985 were recently restated by the Fifth Circuit in *Westberry v. Gilman Paper Co.*, 507 F.2d 206 (1975):

> This requires that the complainant show that there was a *conspiracy;* that such conspiracy be for the *purpose* of depriving an individual of the equal protection of the laws; that the conspirators *acted* in furtherance of their conspiracy; and that the plaintiff was *injured* in his person or property or actually deprived of a citizen's right or privilege.

*Id.* at 214 (emphasis in original). Thus, in order to prevail, plaintiffs must show, among other things, that the defendant homes conspired among themselves or with DPS or both to continue accepting DPS referrals with the intent to deprive plaintiffs "of the equal enjoyment of rights secured by the law to all." *Griffin v. Breckenridge, supra,* at 102, 91 S.Ct. at 1798. The evidence establishes no such purposeful agreement or action on the part of the homes. The evidence demonstrates that the homes were aware of the prohibition against referrals to noncomplying homes by DPS, were somewhat surprised at receiving continued referrals by DPS county workers, and continued to accept referrals from all sources. Though acquiescence in illegal conduct may be sufficient to constitute a conspiracy when combined with participation and intent, *see, e. g., Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939), proof of acquiescence alone does not establish the intent necessary for liability under Section 1985(3). Absent proof of such intent, plaintiffs' claims under that statute fail.

An appropriate order made in accordance with the foregoing findings and conclusions will be entered.