582 F.2d 203
 49 A.L.R.Fed. 941
 Arthur V. GRASECK, Jr., Plaintiff-Appellant,
v.
Angelo MAUCERI, Individually and as Administrative Judge of
the District Court of Suffolk County, Edward U.
Green, Jr., Individually and as a Judge
of the District Court of
Suffolk County, Defendants,
John F. Middlemiss, Jr., Individually and as
Attorney-in-Charge, Legal Aid Society of Suffolk
County, New York, Defendant-Appellee,
Ralph Costello, Individually and as Attorney-in-Charge of
the District Court Bureau of the Criminal Division
of the Legal Aid Society of Suffolk
County, New York, Defendant,
Legal Aid Society of Suffolk County, New York, Defendant-Appellee.
 No. 920, Docket 77-7572.
 United States Court of Appeals,
Second Circuit.
 Argued March 31, 1978.
Decided Aug. 7, 1978.
 
 Frederick J. Damski, New York Civil Liberties Union, Smithtown, N. Y. (Harlon L. Dalton, Burt Neuborne, New York City, Arthur V. Graseck, Jr., Port Washington, N. Y., of counsel), for appellant.
 Joseph P. Hoey, Brady, Tarpey, Hoey, P. C., New York City, for appellees John F. Middlemiss, Jr., and Legal Aid Society of Suffolk County, New York.
 Before FEINBERG, MANSFIELD and OAKES, Circuit Judges.
 OAKES, Circuit Judge:
 
 
 1
 This appeal requires us to determine whether conduct of a fundamentally private institution challenged on constitutional grounds constitutes "state action", one of the more slippery and troublesome areas of civil rights litigation. Appellant brought suit under 42 U.S.C. § 1983[1] and its jurisdictional counterpart, 28 U.S.C. § 1343, alleging that his discharge by the Legal Aid Society of Suffolk County, New York (the Society), violated the First, Sixth and Fourteenth Amendments. He sought a declaratory judgment, reinstatement and back pay. The United States District Court for the Eastern District of New York, Jacob Mishler, Chief Judge, dismissed the complaint[2] after a bench trial,[3] holding that appellees had not acted under color of state law.[4] Graseck v. Mauceri, No. 74-C-1157 (E.D.N.Y., dated Oct. 28, 1977). Since we agree that the Society's discharge of appellant did not constitute state action,[5] we affirm.
 
 I. FACTS
 
 2
 Arthur Graseck began working for Legal Aid as a staff attorney on July 12, 1971, and was assigned to the District Court Bureau of the Criminal Division in Hauppauge, Long Island. Following a number of incidents detailed below, he was discharged by his supervisor, John Middlemiss,[6] on October 13, 1972, after he refused to resign.[7] On November 15, the Personnel Committee of the Society held a hearing to review appellant's termination,[8] particularly appellant's charge that judicial pressure provoked the decision. The committee upheld the dismissal,[9] as did the Society's board of directors on January 24, 1973.[10]
 
 
 3
 The district court found that appellant was discharged due to his inability to work with colleagues and to follow established rules, his repeated exercise of poor judgment, and his continual absence from assigned areas. In other words, Graseck was asked to resign because his conduct over the course of the year disrupted the efficient operation of the Society. These were substantially the reasons proffered by Middlemiss and Costello.[11] The events which culminated in the dismissal must be explored at some length in order fully to appreciate Chief Judge Mishler's conclusion that the discharge, far from being a reaction to judicial pressure, resulted from the independent managerial decision of the Society.
 
 
 4
 According to the district court, Graseck's inability to work with other staff attorneys stemmed from his repeated interference with their clients. For example, a heated argument between appellant and a Ms. Mottenburg ensued after he took her client's file without informing her. When the case was called, no one answered and a bench warrant was issued for the client's arrest. Similarly, on at least three other occasions, without consulting assigned counsel, he induced their clients either not to plead guilty after a contrary decision had been made or to withdraw their pleas. This conduct, however much it may have aided the individual client, obviously created tension and friction between appellant and his co-workers.
 
 
 5
 The district court referred to three incidents to support its finding that "(p)laintiff's overwhelming desire to protect and defend his assigned clients often led him to exercise poor judgment and to deviate from established standards of conduct. This weakness particularly emerged in his relations with the judges of the District Court." Graseck v. Mauceri, supra, No. 74-C-1157, at 8. Two of the incidents, involving confrontations with state judges, form the basis of appellant's assertion that his dismissal directly resulted from the Society's inability to withstand the pressure imposed by these judges, and hence was "state action." The first occurred in February, 1972. After a presiding judge in a criminal trial denied appellant's request for production of certain police records, Judge Mauceri, the administrative judge of the district court, denied a subpoena duces tecum. Appellant then unsuccessfully presented the subpoena to a third judge, without disclosing the previous denials. Thereafter Graseck, again without revealing the previous denials, asked another staff attorney to submit the subpoena to a fourth judge, who signed the subpoena. Upon discovering what he considered to be improper conduct, Judge Mauceri suggested to Thomas Boyle, the attorney-in-charge of the District Court Bureau at that time, that Grasek be transferred from the Bureau. Boyle consulted with Middlemiss, and they agreed that a transfer "would constitute a submission by the Society to the authority of the court in a matter which solely concerned the Society." Id. at 9-10. Accordingly, they did not succumb to the judge's suggestion. Shortly thereafter, Judge Mauceri explained in a transcribed meeting with Boyle and appellant:
 
 
 6
 As far as your practice, I don't want you to limit yourself or your ability to defend the clients the way you see fit. I don't intend to do that but you have to do it within the purview of the rules and regulations of ethics. Every lawyer is bound by it, not only you but everyone, whether it be a private attorney or one working for the State as you are.
 
 
 7
 The judge warned appellant that he would refer the matter to the Character Committee of the Bar Association if Graseck engaged in similar conduct in the future. He ended the meeting on an optimistic note, however, stating: "I hope this is the end of it."
 
 
 8
 The second run-in with the judiciary occurred in late September, 1972, when appellant moved to dismiss a misdemeanor case for failure to prosecute. In the affirmation accompanying the motion, he accused Judge Green of being an agent of the district attorney, endeavoring to accommodate the People's desires at the cost of the defendant's constitutional and statutory rights. When the judge learned of the charges he requested a conference with appellant and Costello.[12] There is conflicting testimony as to the message Judge Green conveyed at the meeting. According to appellant, the judge banned him from further appearances in his courtroom. Judge Green recalled having instructed appellant to ask for the former's disqualification in any future case in which appellant feared bias. That Graseck did appear before the judge subsequent to the conference was supported by Judge Green's testimony and documentary evidence. Judge Green also testified that he never intended to prompt Graseck's dismissal by requesting the conference. The district court accepted Judge Green's version of the discussion. The evidence supports this finding.
 
 
 9
 The third episode which, according to the district court, revealed appellant's poor judgment and was a factor underlying Middlemiss's decision to seek Graseck's dismissal, involved Graseck's attempt to bring an Article 78 proceeding against a trial judge. His purpose was to compel the judge to indicate in the records that a trial had been adjourned because of the prosecutor's lack of readiness rather than court congestion. After Graseck filed the papers at the Supreme Court in Riverhead, and an official there informed Middlemiss of Graseck's action, Middlemiss ordered appellant to stop pursuit of the action and to return to the district court. Evidently, Middlemiss was irritated by Graseck's recurring crusades for his clients which often precluded his availability for more routine matters.
 
 
 10
 Chief Judge Mishler found three additional incidents revelatory of appellant's inability to follow established rules. The most critical, for purposes of deciding the state action issue, involved a second confrontation with Judge Mauceri. On October 12, 1972, appellant left a ball point pen with a client during a visit in the holding pen. Upon discovery, a guard prohibited appellant from entering the holding pen and informed Judge Mauceri of the security considerations involved. Whether the security personnel had previously given instructions never to leave such instruments with detainees because of their potential use as weapons is in dispute. Judge Mauceri issued an order barring Graseck from entering the holding pen, telephoned Middlemiss to apprise him of the order and then sent Middlemiss written confirmation of his decision.[13] What was said during the telephone conversation is also disputed. Boyle testified[14] that Middlemiss told him that Mauceri had stated, "You have got to get this guy out of my court." Trial Transcript at 1-70. Middlemiss and Mauceri denied that any such statement was made. Judge Mauceri also denied having intended to pressure the Society into dismissing appellant or even having contemplated the possibility of dismissal.[15]
 
 
 11
 Judge Mauceri was not the only person who objected to appellant's practices. Appellant was prohibited by an assistant district attorney from entering the district attorney's office without accompaniment after Graseck was discovered one day rummaging through the office's files after 5:00 p. m. And Middlemiss revealed that appellant had loaned to outsiders minutes of Legal Aid cases on several occasions without the requisite approval.
 
 
 12
 The district court lastly found that complaints received by Costello almost on a daily basis about Graseck's absence from his assigned part played a role in the Society's decision to seek his removal. Although these continual absences were caused by appellant's good faith attempts to aid his clients, they disrupted the organizational framework of the Society and often shifted appellant's work load onto the shoulders of his already overburdened colleagues.
 
 
 13
 The district court's findings regarding the events underlying the dismissal decision are not clearly erroneous and find support in the record. The question presented for review then, simply stated, is whether the judicial criticism of appellant together with the working relationship between the Society and the state judges constituted sufficient state involvement in the dismissal as to constitute "state action."
 
 II. DISCUSSION
 
 14
 A prerequisite for any relief under Section 1983, of course, is that the defendant have acted under color of state law. See notes 1 & 5 Supra. There is no dispute over the Society's fundamentally private nature.[16] Nevertheless, appellant asserts that the dismissal amounted to state action because (1) the private entity conspired with state officials to perform an unconstitutional act, Adickes v. S. H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); United States v. Price, 383 U.S. 787, 794, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966), and (2) the State, through its judicial officers' conduct and its administrative and financial support of the Society, "significantly involved itself" in the administration of the private institution, See Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 173, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); Reitman v. Mulkey, 387 U.S. 369, 380, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), and developed a "symbiotic relationship" with the private organization. See Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).
 
 
 15
 We believe that Lefcourt v. Legal Aid Society, 445 F.2d 1150 (2d Cir. 1971), is dispositive of most of the theories advanced by appellant and that the additional facts extant in this case do not compel a contrary result. In Lefcourt, a panel of this court held that the dismissal of a legal aid attorney by the Legal Aid Society of the City of New York was not performed under color of state law, notwithstanding the receipt of substantial government funds by the Society.[17] The lack of governmental control over or interference with the Society's affairs was deemed pivotal.[18] Id. at 1155.
 
 
 16
 The similarities between Lefcourt and the facts before us are, not surprisingly, striking. The bylaws of both societies are almost identical, See note 16 Supra, their respective contracts were made pursuant to the same New York law requiring the State to implement a plan for furnishing counsel to indigent defendants, See Lefcourt v. Legal Aid Society, supra, 445 F.2d at 1155, they both receive substantial government funding (although the Society in Lefcourt evidently received some funds for its criminal division from private sources),[19] they are both housed in government buildings, and, most importantly, there is no formal mechanism through which any government entity can exercise control or supervision over the internal operations of the societies. See id.
 
 
 17
 Thus far, Lefcourt supports if not compels a finding of no state action. Its reasoning applies with equal force to the instant facts:
 
 
 18
 (I)t cannot be said that the Society acts under color of State law by virtue of the financial and other benefits[20] which it receives from the City and various other governmental agencies, courts and subdivisions, since there has been no sufficient showing of governmental control, regulation or interference with the manner in which the Society conducts its affairs.
 
 
 19
 Id. (footnote omitted).
 
 
 20
 The crucial question is whether the actions of Judges Mauceri and Green, and in particular their communications with Graseck's supervisors, provide sufficient involvement in the discharge to distinguish Lefcourt and to render the conduct of the Society that of the State. Since the judges in no sense actively participated in the decision-making process itself, it must be determined whether they encouraged or coerced the dismissal, See, e. g., Flagg Brothers, Inc. v. Brooks, --- U.S. ----, ----, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978); Jackson v. Metropolitan Edison Co., 419 U.S. 345, 356 n.15, 357 and n.17, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); Moose Lodge No. 107 v. Irvis, supra, 407 U.S. at 173, 176-77, 92 S.Ct. 1965; Schlein v. Milford Hospital, Inc., 561 F.2d 427, 428-29 (2d Cir. 1977) (per curiam); Taylor v. Consolidated Edison Co. of New York, Inc., 552 F.2d 39, 43, 46 (2d Cir. 1977); Note, State Action: Theories for Applying Constitutional Restrictions to Private Activities, 74 Colum.L.Rev. 656, 680, 682-83 (1974). And even if that question were answered affirmatively, the question would remain whether the discharge was in response to their requests. See Writers Guild of America, West, Inc. v. FCC, 423 F.Supp. 1064, 1136-38, 1140 (C.D.Cal.1976) (especially discussion of prior state action cases); Cf. Herrmann v. Moore, 576 F.2d 453, at 456 (2d Cir. 1978) (no "deprivation" under 42 U.S.C. § 1983 where trial continued despite alleged attempts by state court judge to impede the action).
 
 
 21
 Appellant asserts that his discharge was in direct response to the judicial pressure imposed on the Society by Judges Green and Mauceri. We are unpersuaded by Graseck's argument, as were the courts below. Judge Weinstein, in dismissing the complaint against the state judges, See notes 2-3 Supra, found totally lacking any evidence that they encouraged or even desired the discharge:
 
 
 22
 There isn't the slightest direct evidence that these judges asked for the resignation or firing of this plaintiff or that they desired it. . . . I don't see how there's any basis for liability here in the judges. . . . There simply has been no case made out. The only thing we have is the hearsay and surmise of the plaintiff, which certainly doesn't suffice.
 
 
 23
 Trial Transcript at 268 (Weinstein trial) (Nov. 26, 1976).[21] Chief Judge Mishler concluded in a similar vein that "their participation was chiefly confined to criticizing plaintiff for his errors of judgment and his misdeeds, and to reporting these incidents to his superiors," Graseck v. Mauceri, supra, No. 74-C-1157, at 24; and that "the decision to dismiss (appellant) resulted from the Independent determination of the Society and was grounded upon (appellant's) entire course of conduct during the twelve month period of his employment at the District Court Bureau." Id. at 25 (emphasis in original).
 
 
 24
 State involvement in any manner in the activities of a private institution does not necessarily establish state action. Its existence depends on "whether there is a sufficiently close nexus between the State and the challenged action of the (private) entity so that the action of the latter may be fairly treated as that of the State itself." Jackson v. Metropolitan Edison Co., supra, 419 U.S. at 351, 95 S.Ct. at 453;[22] Moose Lodge No. 107 v. Irvis, supra, 407 U.S. at 176, 92 S.Ct. 1965. In the typical case, the question posed is relatively simple: was the state "involved not simply with some activity of the institution alleged to have inflicted injury upon a plaintiff But with the activity that caused the injury (?)" Powe v. Miles, 407 F.2d 73, 81 (2d Cir. 1968) (emphasis added). The instant case presents a slightly different inquiry, however, because the conflicts between Graseck and the judges undisputedly were among the factors which prompted the Society's decision to discharge appellant. Thus, there is an attenuated causal connection between the conduct of the judges and the action taken by the Society that normally does not exist in the regulatory context. It still must be determined, however, whether the state judges placed their "imprimatur" on the Society's conduct, Jackson v. Metropolitan Edison Co., supra, 419 U.S. at 357, 95 S.Ct. 449, by expressing their unhappiness and requesting the Society to control its attorney. In the words of the Supreme Court, "where the (state) has not put its own weight on the side of the proposed practice by ordering it, . . . a practice initiated by the (private entity) and approved by the (state is not transmuted) into 'state action.' " Id. at 357, 95 S.Ct. at 456. But where it has done so, Jackson seems to imply, there perhaps may be state action. Cf. Note, Supra, 74 Colum.L.Rev. at 656, 682 n.166, 683 (relying on Second Circuit cases for the proposition that state action "does not require that government command, regulate or influence the challenged activity. It is enough that government influence or encourage private persons to perform functions or implement policies in the course of which a challenged activity occurred." (footnote omitted)).
 
 
 25
 Our review of the three incidents deemed crucial by appellant convinces us that the limited nature of the judges' conduct complained of precludes a finding of state action. The chain of events following Judge Mauceri's communications after the subpoena incident is quite revelatory of his lack of influence over both the Society's internal operations in general and its ultimate decision to discharge Graseck. Boyle and Middlemiss adamantly refused to transfer appellant, contrary to the judge's suggestion. From the transcript of the subsequent meeting, it is apparent that not only had Judge Mauceri by this time acquiesced in the Society's decision, but he was hopeful of a good working relationship in the future. The judge did not again have contact with the Society concerning Graseck until the pen incident, some eight months later. Thus, the evidence refutes the notion that Graseck's discharge was in response to Judge Mauceri's transfer suggestion. Moreover, there is no indication that the judge directly or indirectly encouraged the dismissal simply by bringing to the attention of the Society with the aim of arresting similar incidents conduct of one of its staff thought by the judge to be improper. See text accompanying notes 23-24 Infra.
 
 
 26
 Appellant's attempt to attribute his dismissal to prompting by Judge Green fares no better. There is no evidence that the judge ever requested, suggested or desired the Society's course of action. He was solely controlling the administration of his court. We do not doubt that the friction between the judge and appellant could have impeded appellant's ability meaningfully to function for the Society; obviously, the Society would not have discounted this concern when it reviewed appellant's past and future utility. But much more in the way of state involvement is necessary to characterize private conduct as that of the State. "(T)he state action, not the private action, must be the subject of the complaint." Powe v. Miles, supra, 407 F.2d at 81. See Taylor v. Consolidated Edison Co. of New York, Inc., supra, 552 F.2d at 43 ("The relationship of the state's involvement to the conduct forming the basis of the constitutional claim is likewise of prime importance. Where the 'private' party is engaged in the alleged deprivation at the state's express direction, the actor may well be subjected to constitutional limitations."). We are unwilling to infer judicial fostering of the dismissal simply because a judicial officer happened to be involved in one of numerous incidents which reflected appellant's inability to work compatibly with the people around him. See text accompanying notes 23-24 Infra.
 
 
 27
 The lack of state direction is further elucidated by the circumstances surrounding Judge Mauceri's order barring Graseck from the holding pen. Undisputedly, appellant's diminished utility to the Society resulting from the order was one reason for his dismissal.[23] We reiterate, however, that it is not the effect alone that government conduct has on private actions which establishes the governmental character of the private action. Rather, it is the degree of government influence and control over the private entity, and in particular over the decision itself that is determinative.[24] Judge Mauceri's order was made to promote the orderly functioning of the criminal court system pursuant to his duties as administrative judge. We refuse to read into this action any other motive, nor could we do so even if willing, given our appellate role. Middlemiss, after discussion with Costello, determined that appellant's discharge was in the best interests of the Society. That the decision was partially based on prior clashes with two state court judges and a desire to promote a good working relationship with these judges (as well as between the staff attorneys) does not shift responsibility for an internal decision generated by an autonomous organization into state action. To characterize the one disputed statement of Judge Mauceri, "to get this guy out of my court," See text accompanying notes 14-15 Supra, as having significantly influenced the dismissal distorts the significance of the statement, made in a moment of anger, as well as the record, brimming with additional incidents, out of all proportion. Judge Mauceri's expression of his displeasure with appellant's behavior was a feeling evidently not unique to the judges. Given the continuing working relationship between the judges and the Society, his attempt to minimize strain through discussion is perfectly understandable. In the final analysis we must, in the light of the district court's findings, view Judge Mauceri's possible request for appellant's removal as no more than an unfortunate expression of outrage which the Society never interpreted as a demand for dismissal.
 
 
 28
 In sum, we agree with the district court that the Society initiated the dismissal based on its own independent evaluation of its needs, rather than at the behest of the state judges.[25] See Taylor v. Consolidated Edison Co. of New York, Inc., supra, 552 F.2d at 45. Official "involvement," if it can even be characterized as such, merely amounted to the judges' contribution of material facts, their reactions thereto, and their exercise of supervisory powers over their courts. There being no official intrusion into the personnel policies of the Society, its management decision may not be attributed to the State.
 
 
 29
 Judgment affirmed.
 
 
 
 [1]
 It provides:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 42 U.S.C. § 1983.
 
 
 [2]
 Defendants Middlemiss and Legal Aid were dismissed at this time. Prior to the trial before Chief Judge Mishler, the case was heard by Judge Weinstein, who at the close of that trial dismissed the complaint against defendants Mauceri, Green and Costello. Pursuant to the remaining defendants' request, Judge Weinstein then recused himself. Thereafter the case was reassigned to Chief Judge Mishler. Appellant's appeal is limited to the dismissal of Middlemiss and Legal Aid
 
 
 [3]
 The case was tried de novo before Chief Judge Mishler, although the transcript from the earlier trial, See note 1 Supra, was admitted into evidence
 
 
 [4]
 The district court alternatively concluded that the discharge did not abridge any constitutional guarantee. It is unnecessary to address this holding
 
 
 [5]
 The "under color of state law" prerequisite of § 1983 is synonymous with the state action requirement of the Fourteenth Amendment as first explicated in Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883). Adickes v. S. H. Kress & Co., 398 U.S. 144, 152 n.7, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); United States v. Price, 383 U.S. 787, 794 n.7, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966). The terms are used interchangeably throughout our discussion
 
 
 [6]
 Middlemiss was attorney-in-charge of Suffolk Legal Aid during Graseck's employment
 
 
 [7]
 Middlemiss discussed the reasons for the discharge in a 45-minute meeting with appellant. He dismissed Graseck when it became apparent that appellant could not adequately explain the numerous incidents culminating in the dismissal. Prior to the meeting, Middlemiss and Ralph Costello, attorney-in-charge of the District Court Bureau for the last six to eight weeks of appellant's employment, had agreed upon the need to dismiss Graseck
 
 
 [8]
 The meeting was divided into three stages. The first was a session open to the public during which civil rights and social service organizations and former clients of appellant spoke on his behalf. A closed session was then conducted with the committee's five members, Costello, Middlemiss, appellant and Thomas Boyle, attorney-in-charge of the District Court Bureau during most of appellant's employment. In this private meeting the four attorneys presented their positions, appellant submitted exhibits, and Boyle spoke on Graseck's behalf
 
 
 [9]
 The vote was four to one
 
 
 [10]
 Appellant was neither informed of nor present at this meeting
 
 
 [11]
 He replaced Thomas Boyle as attorney-in-charge of the District Court Bureau after Boyle transferred to the Riverhead office
 
 
 [12]
 After the meeting, Costello criticized appellant for the language used in the affirmation and reported the incident to Middlemiss
 
 
 [13]
 The letter stated:
 One of your attorneys, Mr. Grasseck (Sic ), committed a very serious offense this morning while visiting a prisoner in the cellblock without the knowledge of the security man. He gave to that prisoner a fountain pen, which could be used as a weapon. This is a serious breach of security and I have issued an order today barring Mr. Grasseck from the cellblock area.
 I think that your office should advise this man of the seriousness of his action so that he does not repeat it at any other location.
 Letter from Administrative Judge Angelo Mauceri to John F. Middlemiss, Jr. (Oct. 12, 1972).
 
 
 [14]
 Boyle resigned from Suffolk Legal Aid in protest over Graseck's dismissal
 
 
 [15]
 To Middlemiss's knowledge, Graseck's was the first and only dismissal of a staff attorney in the Society's history
 
 
 [16]
 The institution exists independent of any state or local regulatory authority. It is a private membership corporation organized under New York corporation law. Pursuant to its bylaws, a board of directors elected by the Society's general members manages the organization. No member of the board is a public official. The attorney-in-charge has authority for the supervision of the branch offices, including the hiring and firing of attorneys, subject to the control of the board
 The Society provides legal services to indigent criminal defendants under a contract with the County of Suffolk, renewed on an annual basis. This contract was made pursuant to New York state law which authorizes the County to utilize "public defender" or "private legal aid" systems. It provides in pertinent part:
 The governing body of each county . . . shall place in operation throughout the county . . . a plan for providing counsel to persons charged with a crime . . . who are financially unable to obtain counsel. Each plan shall also provide for investigative, expert and other services necessary for an adequate defense. The plan shall conform to one of the following:
 
 
 [2]
 (R)epresentation by counsel furnished by a Private legal aid bureau or society designated by the county or city, organized and operating to give legal assistance and representation to persons charged with a crime within the city or county who are financially unable to obtain counsel
 
 
 [3]
 Representation by counsel furnished pursuant to a plan of a bar association
 
 
 [4]
 Representation according to a plan containing a combination of any of the foregoing
 N.Y.County Law, art. 18-B, § 722 (McKinney Supp.1977-78) (emphasis added).
 
 
 [17]
 Chief Judge Mishler was aware of the more rigorous scrutiny imposed when challenged activity does not involve racial discrimination. See Lefcourt v. Legal Aid Soc'y, 445 F.2d 1150, 1155 n.6 (2d Cir. 1971). We agree that the less stringent state action standard utilized in racial discrimination cases is inapplicable here. Schlein v. Milford Hosp., Inc., 561 F.2d 427, 428 n.5 (2d Cir. 1977) (per curiam); Taylor v. Consol. Edison Co. of New York, Inc., 552 F.2d 39, 42-43 (2d Cir. 1977); Jackson v. Statler Foundation, 496 F.2d 623, 629, 635 (2d Cir. 1974), Cert. denied, 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397 (1975). But see, e. g., Downs v. Sawtelle, No. 77-1260, 574 F.2d 1, at 6 n.5 (1st Cir. 1978) (urging that "fundamental rights" should receive identical scrutiny)
 
 
 [18]
 The court in Lefcourt also rejected the public function theory of state action holding:
 Although the Society by contract has undertaken to make available to indigents legal services which otherwise governmental agencies might have to assume, its history, constitution, by-laws, organization and management definitely establish that it is a private institution in no manner under State or City supervision or control.
 Lefcourt v. Legal Aid Soc'y, supra, 445 F.2d at 1156-57 (footnote omitted). See also Flagg Bros., Inc. v. Brooks, --- U.S. ----, ---- - ----, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978) (rejecting public function doctrine of state action where challenged private conduct is not an exclusive prerogative of the State); But see id. at ----, 98 S.Ct. 1729 (refusing to consider whether state action is implicated by delegation to private parties of functions traditionally more exclusive than dispute resolution, such as education).
 
 
 [19]
 The criminal division of the Society in the case before us is entirely funded by the Suffolk County Legislature
 
 
 [20]
 Appellant lists as additional indicia of state action Judge Mauceri's request for funds for the Society in his 1971 annual address to the County Legislature, his having provided the Society with a Spanish-speaking interpreter, and his adjustment of certain court procedures to accommodate the Society when its caseload became excessive. Such minimal courtesies to ensure the continued efficient operation of the Society and concomitantly of the criminal courts are hardly grounds for distinguishing this case from Lefcourt. Moreover, as is true of the factors analogous to both cases, there is no relationship or nexus between state involvement of this sort and the challenged dismissal. See note 22 Infra
 
 
 [21]
 We note that at the conclusion of the initial trial Judge Weinstein found the evidence too indirect to justify retention of the state judges as parties. He was, however, not discussing their involvement with the Society for purposes of establishing state action. In fact, Judge Weinstein denied a motion to dismiss for lack of jurisdiction, finding state action from the close working relationship between the District Court of Suffolk County and the Society. Trial Transcript at 269 (Weinstein trial) (Nov. 26, 1976)
 
 
 [22]
 The Supreme Court has not yet addressed the extent to which the "symbiotic relationship" analysis of Burton v. Wilmington Parking Auth., 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), survives Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). We have held that the relationship between the state and a private entity may be so extensive that the actions of the ostensibly private institution will fall within the ambit of state action, even in the absence of direct state involvement in the challenged activity. Holodnak v. Avco Corp., 514 F.2d 285, 288 (2d Cir.), Cert. denied, 423 U.S. 892, 96 S.Ct. 188, 46 L.Ed.2d 123 (1975). Accord, e. g., Downs v. Sawtelle, supra, No. 77-1260, at 8; Chalfant v. Wilmington Inst., 574 F.2d 739, at 745 (3d Cir. 1978) (en banc); Braden v. Univ. of Pittsburgh, 552 F.2d 948, 956-58 (3d Cir. 1977) (en banc); Weise v. Syracuse Univ., 522 F.2d 397, 407 n.12 (2d Cir. 1975). Not unmindful of the close working relationship here, we believe that the absence of governmental participation, let alone of "substantial" participation, in the Society's general management and internal operations precludes a finding in this case of the degree of pervasive interdependence or partnership contemplated by Burton. See Braden v. Univ. of Pittsburgh, supra, 552 F.2d at 959-61; Jackson v. Statler Foundation, supra, 496 F.2d at 635; Cf. Schlein v. Milford Hosp., Inc., supra, 561 F.2d at 428-29 (holding no state action because of absence of a nexus without discussing symbiotic relationship analysis, where the state played no part in either formulating hiring procedures of hospital or applying them to appellant)
 
 
 [23]
 Middlemiss testified that his decision to discharge appellant crystalized after the pen incident not only because of Graseck's impaired utility to the Society stemming from Judge Mauceri's order, but also because of the extreme impropriety and seriousness of Graseck's conduct
 
 
 [24]
 Appellant's reliance on Writers Guild of America, West, Inc. v. FCC, 423 F.Supp. 1064 (C.D.Cal.1976), is unavailing. Judge Ferguson there stated, after a thorough review of the state action doctrine, that mere governmental encouragement of a programming policy ultimately adopted by the major networks would not suffice to invoke the doctrine. 423 F.Supp. at 1135-40. The court found state action extant due to the FCC's exertion of significant pressure to adopt the policy accompanied by threats of severe sanctions. Id. at 1140-43. See Kuczo v. Western Connecticut Broadcasting Co., 566 F.2d 384, 387-88 (2d Cir. 1977). In other words, the private decision was not an independent one. Here, by contrast, evidence of active encouragement is meager; evidence of pressure to discharge appellant is totally lacking
 
 
 [25]
 To the extent that the conspiracy theory of state action utilized in Adickes v. S. H. Kress & Co., supra, is distinguishable from the coercion or encouragement theory discussed above, Compare Writers Guild of America, West, Inc. v. FCC, supra, 423 F.Supp. at 1138-39 n.129 (noting a possible difference), With Flagg Bros., Inc. v. Brooks, supra, --- U.S. at ----, 98 S.Ct. 1729 (implying no difference), it is inapplicable here. The state judges' lack of encouragement to dismiss appellant and lack of intent in this regard belie the existence of a conspiracy