Charles C. GRAY

v.

**PROJECT MORE, INC., Sherrill E. Moore.**

Civ. No. N–79–61.

United States District Court, D. Connecticut.

April 18, 1979.

Leroy Jones, Mongillo, Insler & Jones, New Haven, Conn., for plaintiff.

James E. Swaine, New Haven, Conn., for defendants.

## MEMORANDUM OF DECISION

ELLEN B. BURNS, District Judge.

Plaintiff served as executive director of defendant Project More, Inc., (hereinafter Project More) prior to his termination from that position during December, 1978. Plaintiff alleges that this termination was in violation of the due process clauses of the fifth and fourteenth amendments. The resolution of this case requires the court "to wade 'into the murky waters of the "state action" doctrine.'" *Jackson v. Statler Foundation*, 496 F.2d 623, 626 (2d Cir. 1974). For the reasons set forth below, the court concludes that there is no federal or state governmental action present and hence no federal jurisdiction.

Plaintiff's complaint, filed on February 27, 1979, alleged the following facts: On November 21, 1977, plaintiff was hired as executive director of Project More, a non-stock, non-profit corporation organized under Connecticut law in 1976. The purpose of Project More is to provide social services and other assistance to persons released or about to be released from prison. Defendant Sherrill Moore (hereinafter Moore) is Chairman of Project More's Board of Directors, which consists of nineteen members.

During October, 1978, some staff members of Project More complained to the

board of directors about the manner in which plaintiff conducted certain internal matters. On December 8, 1978, defendant Moore sent a letter to plaintiff stating that plaintiff was under suspension pending a full hearing. Attached to this letter was a report of three members of the personnel committee. On December 21, 1978, the board of directors held a closed executive session which sustained the personnel committee's report.[1]

Plaintiff raises certain due process allegations, claiming violation of the fifth and fourteenth amendments of the federal constitution, and Article I, § 8 of the Connecticut constitution. He seeks a preliminary injunction against the continuation of plaintiff's suspension and/or termination and $50,000 in damages. Jurisdiction is based upon 28 U.S.C. § 1331, federal question jurisdiction.

On March 9, 1979, and March 21, 1979, defendants filed a motion to dismiss and a brief in support, respectively. Among the arguments raised by defendants[2] is the lack of state or federal action. On March 27, 1979, plaintiff responded to the motion to dismiss, stressing Project More's affiliation with various governmental agencies. Oral argument was held on March 28, 1979, on defendants' motion to dismiss. An evidentiary hearing was held on April 9, and April 12, 1979, on plaintiff's motion for a preliminary injunction.

■ Although some rights established either by the Constitution or by federal law are protected from both governmental and private deprivation, e. g., *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976) (discussing 42 U.S.C. § 1981); *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968) (discussing 42 U.S.C. § 1982), the law is well-settled that the fourteenth amendment and 42 U.S.C. § 1983 require "state action."[3] *The Civil Rights Cases*, 109 U.S. 3, 11, 3 S.Ct. 18, 27 L.Ed. 835 (1883). However, under certain circumstances, the actions of a private individual or entity may

---

1. At the hearing on the preliminary injunction, it appeared that the Board of Directors of Project More voted to terminate plaintiff's employment on February 28, 1979.

2. Defendants' motion to dismiss raises four other grounds for dismissal: (1) plaintiff has failed to allege a jurisdictional amount above $10,000 pursuant to 28 U.S.C. § 1331; (2) plaintiff has not alleged a property interest protectable by the fourteenth amendment; (3) plaintiff has not alleged a liberty interest protectable by the fourteenth amendment; and (4) defendant Moore is entitled to a qualified immunity. Also outstanding is plaintiff's motion for certification of a class of defendants consisting of Project More's board of directors. The court will not entertain these motions in light of its ruling that there is no governmental action present and hence no federal constitutional jurisdiction.

3. The fifth amendment provides in pertinent part: "No person shall . . . be deprived of life, liberty, or property without due process of law." The fourteenth amendment provides in pertinent part: "(N)or shall any State deprive any person of life, liberty, or property, without due process of law." 42 U.S.C. § 1983 reads in full:
   Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
   While the fifth amendment applies to *federal* actions, the fourteenth amendment and § 1983 apply to *state* actions. Numerous courts have held that the "state action" requirement of the fourteenth amendment is equivalent to the "under color of State law" requirement of § 1983. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152 n. 7, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *United States v. Price*, 383 U.S. 787, 794–95 n.7, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966); *Graseck v. Mauceri*, 582 F.2d 203, 204 n. 5 (2d Cir. 1978); *Schlein v. Milford Hospital, Inc.*, 561 F.2d 427, 428 n. 1 (2d Cir. 1977); *Lefcourt v. Legal Aid Society*, 445 F.2d 1150, 1153 n. 1 (2d Cir. 1971).
   In the instant case, plaintiff alleges that Project More has affiliations with various municipal, state, and federal agencies, so that this court is concerned with federal action under the fifth amendment and/or state action under the fourteenth amendment and § 1983. Whenever the term "state action" is used in this opinion with respect to Project More, the term incorporates both state and federal governmental activity.

be sufficiently related to those of the state so that the invocation of the fourteenth amendment or 42 U.S.C. § 1983 is appropriate. Plaintiff has asked this court to apply either the "state entanglement" theory or the "state function" theory to the facts in the instant case.[4]

■ The "state entanglement" theory provides that there is "state action" when the state becomes entangled with the activities of private persons. This theory has its genesis in *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), in which the actions of a private restaurant were imputed to the defendant parking authority, an agency of the State of Delaware. The defendant Eagle Coffee Shoppe, Inc., a lessee in an off-street automobile parking building owned and operated by the defendant authority, refused to serve plaintiff, a black person. The United States Supreme Court reversed the Delaware Supreme Court's holding that the restaurant had acted in a purely private capacity under the lease. More than a superficial glance is necessary to determine if state action is present: "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." *Id.* at 721–22, 81 S.Ct. at 860. In *Burton*, the Court emphasized the conferral of "mutual benefits" between the restaurant and the authority, *id.* at 724, 81 S.Ct. 856, observing,

> The state has so far insinuated itself into a position of interdependence with Eagle that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so "purely private" as to fall without the scope of the Fourteenth Amendment.

*Id.* at 725, 81 S.Ct. at 862. The connection in *Burton* later was described as a "symbiotic relationship between lessor and lessee." *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 175, 92 S.Ct. 1965, 1972, 32 L.Ed.2d 627 (1972).

The Court has made clear that state regulation alone is not sufficient to invoke state action. *Moose Lodge No. 107 v. Irvis, supra*, involved the granting of a liquor permit to a private fraternal organization which denied admission to blacks. The Court held there was no state action present because the Pennsylvania Liquor Control Board played "absolutely no part in establishing or enforcing the membership or guest policies of the club that it licenses to service liquor." *Id.* at 175, 92 S.Ct. at 1972–1973. Thus, there was no nexus between the governmental involvement and the private conduct about which there was a complaint. The Court reached a similar conclusion in *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), in which the defendant was a privately owned and operated corporation holding a certificate of public convenience issued by the Pennsylvania Public Utility Commission, thereby entitling it to deliver electricity to defined service areas. The plaintiff complained that the defendant's policy of terminating service without reasonable notice to a customer violated the due process clause of the fourteenth amendment. No state action was found despite extensive state regulation:

> The mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment. . . . Nor does the fact that the regulation is extensive and detailed, as in the

---

4. A third theory, "state likeness," had an apparently short-lived existence. Under this theory, a private industry is considered to be the state when the industry physically resembles the state with respect to the individual involved. *Marsh v. Alabama*, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946) applied this concept to a privately-owned industrial town. *Food Employees, etc., Local 590 v. Logan Valley*, 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968) applied *Marsh* to a private shopping center. Serious exceptions to *Logan Valley* were carved out by the court in *Lloyd v. Tanner*, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972). *Logan Valley* was overruled in *Hudgens v. NLRB*, 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976). All that may remain under this "state likeness" theory is the unique circumstances of *Marsh*.

case of most public utilities, do so. . . . It may well be that acts of a heavily regulated utility with at least something of a governmentally protected monopoly will more readily be found to be "state" acts than will the acts of an entity lacking these characteristics. But the inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself. . . . The true nature of the State's involvement may not be immediately obvious, and detailed inquiry may be required in order to determine whether the test is met.

*Id.* at 350–51, 95 S.Ct. at 453–454 (citations omitted).

Under various circumstances, the Second Circuit has ruled that there was no state action present when the defendant was a non-profit social services agency, like the defendant project in the instant case. The plaintiff in *Lefcourt v. Legal Aid Society,* 445 F.2d 1150 (2d Cir. 1971) argued that his discharge from his position as a staff attorney was in violation of the first and fourteenth amendments. The defendant legal aid society had been under contract with New York City to provide legal assistance to indigents facing criminal charges in its courts. However, this contractual relationship was insufficient to confer state action upon the defendant. The court emphasized that the defendant society was managed by individual persons and that the city had no input into its personnel policies. The holding in *Lefcourt* was reaffirmed several years later in *Graseck v. Mauceri,* 582 F.2d 203 (2d Cir. 1978), in which the plaintiff alleged constitutional violations in his termination of employment as staff attorney with the defendant Legal Aid Society of Suffolk County, New York. The legal aid society here was identical to that in *Lefcourt* in that the society had a contract with Suffolk County to provide legal services to indigent criminal defendants but was managed entirely by private citizens. Again, the court found no state action. The same conclusion was reached by the court in *New York City Jaycees, Inc. v. United States Jaycees, Inc.,* 512 F.2d 856 (2d Cir. 1975), which challenged the males-only admission policy of the defendant nationwide non-profit organization. The court held there was no state action present because "plaintiff has made no showing that the government is substantially, or even minimally, involved in the adoption or enforcement of these policies." *Id.* at 859. *See also Schlein v. Milford Hospital, Inc.,* 561 F.2d 427 (2d Cir. 1977) (state regulation of hospitals does not convert private hospital's denial of plaintiff doctor's application for staff privileges into state action); *Powe v. Miles,* 407 F.2d 73 (2d Cir. 1968) (state's regulation of educational standards does not change private university's activities into state action).

Similar results were obtained in two other decisions concerning alleged constitutional violations by social services organizations. The plaintiffs in *Player v. State of Alabama, Department of Pensions & Security,* 400 F.Supp. 249 (M.D.Ala.1975), alleged racial discrimination in the placement of children by the state welfare department and licensed institutions for children. The district court dismissed the claim against the institutions, holding that the specific licensing requirements and regulations did not convert the activities of the institutions into state action:

> None of the regulations or licensing requirements relate to the admissions practices of the homes. None define the types of children which can or cannot be accepted. The granting of the license, or the enforcement of the regulations, cannot be said to encourage or foster the discriminatory admissions policies.

*Id.* at 261.

A situation analogous to that in the instant case was presented in *Kelley v. Action for Boston Community Development,* 419 F.Supp. 511 (D.Mass.1976). Plaintiff had been employed as a teacher for Project Head Start, operated under the auspices of Action for Boston Community Development (ABCD) and South Boston Action Council (SBAC). Defendant ABCD was a non-prof-

it corporation and a community action agency within the meaning of the Economic Opportunity Act of 1964, 42 U.S.C. § 2790; defendant SBAC was also a non-profit corporation and a neighborhood-based organization within the meaning of the same act, 42 U.S.C. § 2791. Plaintiff alleged that she had been terminated in violation of the due process clause. The classrooms operated by Project Head Start in South Boston were supervised in part by the Massachusetts Office of Children, which had extensive regulations on admissions, transportation, physical plant and equipment, number and general qualifications of staff, nutrition, recordkeeping, and organization and finance. However, no state action was found to be present:

> These regulations undoubtedly have considerable impact on the day-to-day operation of any Head Start classroom in the Commonwealth. Such regulation, however, is insufficient to support a finding that the actions complained of here were done "under color of state law." . . .

> In the instant case, although Massachusetts may be intimately involved with providing day care services to pre-school children, there is no indication that this regulation extends so far as to include the sanctioning, approval, or even toleration of procedures for the discharge of Head Start employees.

*Id.* at 516–17.

In all the cases discussed above, the federal courts uniformly dismissed the plaintiffs' claims. The only suit to take a different route was *Jackson v. Statler Foundation*, 496 F.2d 623 (2d Cir. 1974). The plaintiff there was a black clergyman who had asked thirteen charitable foundations to hire him as a director of their foundations, provide money for scholarships for his children and grant money for his own founda-

tion; all thirteen defendants refused his requests. The district court dismissed for lack of state action. The Second Circuit remanded the action to the district court, asking the lower court to reconsider its position in light of the following five factors:

> A review of the "state action" case law suggests five factors which are particularly important to a determination of "state action": (1) the degree to which the "private" organization is dependent on governmental aid; (2) the extent and intrusiveness of the governmental regulatory scheme; (3) whether that scheme connotes government approval of the activity or whether the assistance is merely provided to all without such connotation; (4) the extent to which the organization serves a public function or acts as a surrogate for the State; (5) whether the organization has legitimate claims to recognition as a "private" organization in associational or other constitutional terms.

> Each of these factors is material; no one factor is conclusive.

*Id.* at 629.[5] However, the district court never reached this factual determination upon remand for it dismissed the claim for plaintiff's failure to appear and to respond to defendants' motion for summary judgment. *Jackson v. Statler Foundation*, Civil Nos. 71–592 & 74–185 (W.D.N.Y. July 18, 1975). The other cases cited above have considered factors 2 and 3 to reach their conclusions that even the imposition of extensive state regulations does not render the activities of a private non-profit organization state action for constitutional purposes.

■ In sum, the United States Supreme Court has made clear in the *Moose Lodge* and *Jackson v. Metropolitan Edison Co.*

---

**5.** Judge Friendly wrote a strong criticism of the *Jackson* opinion in his dissent to the court's denial of reconsideration en banc:

> (I)n my [opinion,] it (the decision) is analytically unsound, dangerously open-ended, and at war with controlling precedent both in the Supreme Court and in this circuit. Indeed, with all deference, it seems to me the most

ill-advised decision with respect to "state action" yet rendered by any court and unless corrected will be the source of enormous damage to the great edifice of private philanthropy which has been one of this country's most distinctive and admirable features.

496 F.2d at 636–37 (Friendly, J., dissenting).

cases that mere governmental regulation of private enterprises does not confer "state action" upon private entities. This viewpoint has been applied in the context of social service agencies in the *Lefcourt, Jaycees, Graseck, Player*, and *Kelley* opinions, in which the courts observed that there must be a nexus between the governmental regulation and the allegedly improper private action. Plaintiff has not demonstrated here any federal or state regulation of Project More and specifically no regulation of the project's personnel policies.

■ Plaintiff raises two additional elements to substantiate his claim of state action. The first is the amount of governmental aid received, factor one in the *Jackson* opinion. In his complaint, plaintiff alleges that Project More receives funding from the Connecticut State Department of Corrections, the Connecticut Commission on Criminal Justice, the City of New Haven, the Department of Housing and Urban Development, the Department of Justice, and the Department of Labor. However, at the hearing on the issuance of a preliminary injunction, plaintiff introduced evidence only of a contract between Project More and the Connecticut Department of Correction, for the provision of social services to Department of Correction clients for the maximum sum of $55,000.

On three occasions the Second Circuit has held that the receipt of government aid by non-profit organizations does not constitute state action. In *Lefcourt v. Legal Aid Society, supra*, the defendant received $1,900,-000 from the City of New York by contract, $545,708 from the Office of Economic Opportunity, and $342,292 from the New York Family Court by contract. Similarly, the legal aid society sued in *Graseck v. Mauceri, supra*, was funded entirely by the Suffolk County Legislature. In both cases the courts held there was no state action. The receipt of government funds also was discussed in *New York City Jaycees, Inc. v. United States Jaycees, Inc., supra*. There the defendant received 31.4% of its total budget from federal funds earmarked for specific civic projects. The court still held that there was no governmental action.

(T)he government in this instance has limited itself to financial support of certain Jaycee programs, leaving the responsibility for program content, administration, management and performance in the hands of the grantees and contractors. The mere receipt of public funds does not convert the activities of a private organization into state activities.

512 F.2d at 859. Plaintiff has given no indication what percentage of the defendant project's total budget is constituted by government aid. However, the *Jaycee* opinion holds that the mere receipt of government aid does not confer state action without the requisite nexus. Such a nexus has not been demonstrated here. *See also Wahba v. New York University*, 492 F.2d 96 (2d Cir.), *cert. denied*, 419 U.S. 874, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974) (receipt of biochemistry grants from National Institute of Health by private university does not convert university's dismissal of biochemistry professor into state action for first amendment purposes).

Two other courts have reached the same conclusion with respect to public funding to private social service agencies. One of the children's homes sued in *Player v. State of Alabama, Department of Pensions & Security, supra*, was the Alabama Sheriffs' Boys Ranch, which received funds from the state sheriffs. The district judge held there was no state action because there was "no evidence that the association [of sheriffs] plays any significant role in the operation or policy-making of the Ranch." 400 F.Supp. at 264. The plaintiff in *Trivits v. Wilmington Institute*, 417 F.Supp. 160 (D.Del.1976) alleged he had been discharged in violation of the due process clause. The defendant institute had an unusual history. From 1857 to 1893 it operated as a private library; from 1893 to the present it was a free public library on city-owned property. However, it was managed by a board of directors, the majority of whom were private citizens. The district court held that there was no state action because there had been no evidence that the City of Wilming-

ton or New Castle County "probed into the Institute's budgetary needs or fiscal administration, or meddled in its overall management, let alone into its employment practices." *Id.* at 166. In both cases there was no nexus between the receipt of government funds and the particular private activity alleged; this deficiency is true in the instant case as well.

■ The second element raised by plaintiff is the tax-exempt status of Project More. The United States Supreme Court cast a doubtful eye upon this proposition in *Walz v. Tax Commission,* 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). There the plaintiff challenged the property tax exemption to religious organizations for properties used solely for religious worship as unconstitutional under the first and fourteenth amendments. The Court held that this nexus was *de minimis,* "The exemption creates only a minimal and remote involvement between church and state . . ." *Id.* at 676, 90 S.Ct. at 1415. In *Jackson v. Statler Foundation, supra,* the Second Circuit stated that, under certain circumstances, private tax-exempt foundations may well involve state action, because, without these exemptions, such foundations might never have been established. 496 F.2d at 629–30. However, in a subsequent case, the Second Circuit has held that there can be no state action unless there is a nexus between the tax-exempt status and individual wrong. "No genuine nexus between the tax exemption and the complained of internal membership policies has been shown and in its absence, there is no constitutional wrong." *New York City Jaycees, Inc. v. United States Jaycees, Inc., supra,* 512 F.2d at 859. Here there is no connection between the tax-exempt status and the personnel policies of Project More, and hence no state action.

The second "state action" theory upon which plaintiff relies is the "state function"

theory, that state action is present when a private individual or entity performs a function usually associated with the government. The two dominant cases in the "state function" area are *Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953) and *Evans v. Newton,* 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966), both dealing with racial discrimination. *Terry* involved the Jaybird Democratic Association, a political club which conducted the only meaningful elections in a Texas county in over fifty years. *Evans* concerned a public park operated by private trustees.[6] In both cases, "state action" was held to be present. The "state function" theory has been analyzed in a more recent Supreme Court opinion, *Flagg Brothers, Inc. v. Brooks,* 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978). There the plaintiff had been evicted from her apartment and the city marshall arranged for plaintiff's goods to be stored at the defendant's warehouse. In accordance with statutory authority, defendant threatened to sell plaintiff's furniture if she failed to pay for the costs of moving and storage. Plaintiff sued under § 1983, claiming that the defendant had acted in violation of the due process and equal protection clauses. The Supreme Court held that the factual situation was an improper one for invoking the "state function" doctrine, stating that this theory only applies to those functions "exclusively reserved to the State." *Id.* at 158, 98 S.Ct. 1729. The court stressed that this case concerned a commercial transaction, traditionally within the realm of private activity. "This system of rights and remedies, recognizing the traditional place of private arrangements in ordering relationships in the commercial world, can hardly be said to have delegated to Flagg Brothers an exclusive prerogative of the sovereign." *Id.* at 160, 98 S.Ct. at 1735.

**6.** In the *Flagg Brothers* decision, the Supreme Court expressed doubt that the *Evans* case was based upon the "state function" theory due to the "experience of several American entrepreneurs who amassed great fortunes by operating parks for recreational purposes." The court

instead emphasized that, despite the transition of the park from a public to a private facility, the city was still involved in the daily maintenance and care of the park. 436 U.S. at 159 n. 8, 98 S.Ct. at 1735 n. 8.

This nation has a long history of private philanthropy, so that gift of charitable acts is by no means exclusively exercised by state or federal governments. Several cases have held that the activities of charitable or social service agencies are not state action under the "state function" theory. In *Lefcourt v. Legal Aid Society, supra,* the plaintiff argued that because the defense of indigent persons accused of criminal activity is mandated by the sixth amendment, the defendant's activities became state action. As in the court's analysis in *Flagg Brothers,* the Second Circuit observed that the representation of criminal defendants is a function normally performed for and by private persons. 445 F.2d at 1156. Moreover, the court ruled that there must be a nexus between the public function performed and the alleged wrongful act.

> Under the contract, the City retains few controls over the Society, and the Society's obligation under the contract is to its clients and not to the City. Furthermore, the hiring and firing practices of the Society as they relate to this case do not involve the manner in which the Society carries on its public function.
>
> Although the Society by contract has undertaken to make available to indigents legal services which otherwise governmental agencies might have to assume, its history, constitution, bylaws, organization and management definitely establish that it is a private institution in no manner under State or City supervision or control. Its very independence from any such control is an assurance that those who receive the benefits of its services will obtain these services in accordance with the highest standards of the Bar.

*Id.* at 1156–57 (footnote omitted). This nexus test was also applied in *New York City Jaycees, Inc. v. United States Jaycees, Inc., supra,* 512 F.2d at 860, "plaintiff's claim does not relate in any way to the public services provided by the Jaycees, but only to the internal membership policies of the organization." *See also Schlein v. Milford Hospital, Inc., supra,* 561 F.2d at 429 (activities of hospital are not functions tra-

ditionally associated with the sovereignty); *Powe v. Miles, supra,* 407 F.2d at 80, (education has never been a state monopoly in this country, even at the primary or secondary levels); *Kelley v. Action for Boston Community Development, supra,* 419 F.Supp. at 517 (maintenance of day-care centers is not a state function).

Nor does the delegation of a state function necessarily invoke state action. The placement of children in need had been the statutory responsibility of the State of Alabama since 1919. However, the state chose to discharge its duties to such children through placements in private homes. *Player v. State of Alabama, Department of Pensions & Security, supra,* 400 F.Supp. at 262. The court nevertheless held that the care of children is not a power traditionally associated with the sovereign and therefore the actions of the defendant private homes were not attributable to the state under the public function theory. *Id.* at 263.

The provision of assistance to persons who have been or are about to be released from prison is clearly a worthwhile cause. However, it is not a function exclusively within realm of governmental activity. Moreover, even if these services were a public function, there is no indication that there is any connection between the exercise of a state function here and plaintiff's suspension or dismissal. In the absence of both these elements, there cannot be state action under the "state function" theory.

In sum, plaintiff has not demonstrated that the activities of defendants Project More and Moore can be attributed to any governmental authority. When there is no state or federal action involved, this court cannot entertain a constitutional challenge. The evidence presented at the hearing on plaintiff's motion for a preliminary injunction suggest that the defendants acted precipitously and unfairly to plaintiff in his employment termination, denying him an effective opportunity to rebut the allegations against him. But the greatest amount of sympathy cannot overcome jurisdictional hurdles. Accordingly, the complaint is dismissed for lack of jurisdiction.

SO ORDERED.